[Civ. No. 15287. Second Dist., Div. One. Nov. 18, 1946.]

ETHEL A. FAHNESTOCK, Appellant, v. NOEL S. FAHNESTOCK, Respondent.

Lewinson & Armstrong for Appellant.

Paul Vallee and Harry J. McClean for Respondent.

YORK, P. J.—Plaintiff wife sued defendant husband for divorce upon the grounds (1) adultery; (2) cruelty, and asked for all of the community property and the custody of their minor child. The answer denied the allegations as to cruelty and admitted the charge of adultery but alleged it had been condoned and forgiven and that ever since such condonation defendant had treated plaintiff with conjugal kindness. Defendant by amended cross-complaint alleged various acts of extreme cruelty inflicted upon him by plaintiff, and prayed for a divorce and an equitable division of the community property, but did not ask for the custody of the minor child.

The court found in paragraph 5 of the findings, that the parties hereto were possessed of the following community property: (a) Their residence valued at $17,500, subject to a first mortgage of $6,000; (b) Household furnishings valued at $5,000; (c) 1942 Ford Coupe; (d) 1941 Chrysler Sedan; (e) Cash in banks $2,516.20; (f) 20 shares capital stock of Prentice-Hall, Inc., valued at $1,300; (g) War Bonds,

face value $1,200; (h) Defendant's right to participate in profit sharing plan of employer, value unknown; (i) Life insurance policies: Aetna for $5,000; New York for $6,000; New York for $7,000; John Hancock for $1,000; Praetorians for $1,000; the cash surrender value of said policies being $3,769.80; (j) Defendant's interest in pension plan of employer valued at $1,500. Also, the court found with respect to the community property as follows:

"6. That defendant is Sales Manager for Prentice-Hall, Inc., . . . under a contract by the terms of which he is paid a commission on sales of publications made by Prentice-Hall, Inc.; that as of May 15, 1945, the current credit balance of commissions due the defendant was the sum of $26,056.00, subject, however, to chargebacks and offsets . . .; that as of the 15th day of April, 1945, defendant had sold services of Prentice-Hall, Inc., on future contracts, for which defendant is entitled to commission when the customers pay, as follows: 1945, $7,133.60; 1947, $4,159.72; 1948, $702.17; 1949, $428.83; that all commissions under future contracts are subject to chargebacks, offsets and cancellations, over which defendant has no control and against which he has no present right of withdrawal; that commissions for services rendered to date of trial, if, as, and when payable to defendant and not subject to chargebacks, offsets and cancellations, are community property."

The court then found (paragraph 7) that the community property should be divided between the parties as follows: *To plaintiff:* (a) the residence and household furnishings, subject to the first mortgage; (b) 1941 Chrysler Sedan; (c) the war bonds; (d) two life insurance policies, i. e., Aetna for $5,000; New York for $6,000, she to pay the premiums thereon.

*To defendant:* "All of the remaining property described in paragraphs 5 and 6 hereof not herein awarded to plaintiff, provided, however, that defendant shall be restrained from withdrawing any of the said current credit balance which as of May 15, 1945, was the sum of $26,056.00, subject to reduction in amount of chargebacks, offsets and cancellations as herein more specifically found, except defendant shall be permitted to receive from and out of the said current credit balance semi-monthly drawing of $700.00 before deductions and withholding for taxes, and shall also be permitted to withdraw from the said balance the additional sum of $1,808.00 for pay-

ment to plaintiff's attorneys and the additional sum of $1,-650.00 for payment to defendant's attorney, and, in addition such amounts as may be allowed . . . as costs and attorney fees on appeal to plaintiff and equal amount of attorney fees to defendant, and the additional sum of $1,808.00, to pay plaintiff for discharge by her of the following obligations: To her mother on account of loan . . . $600.00; To her attorneys on account of loan . . . $750.00; To Shreve & Co. on account of purchase of silver . . . $350.00; To plumber on account of repairs to house . . . $108.00; Total $1,808.00.

"8. The Court further finds that under the contract of employment between Prentice-Hall, Inc. and defendant, defendant is entitled to receive the sum of $700.00 semi-monthly, before deductions or withholding for income taxes, provided that the said current credit balance is not reduced below the sum of $7,500.00, and that if and when the said current balance is reduced below the said sum of $7,500.00, the said semi-monthly withdrawal is subject to reduction in amount in accordance with the standard drawing account plan of Prentice-Hall, Inc.; that as of the date of trial the semi-monthly drawing account of defendant against the said current credit balance is the sum of $700.00 before deductions or withholding for income taxes. The Court further finds that the current credit balance aforesaid . . . prior to entry of interlocutory judgment herein should be withdrawn by defendant only to pay defendant's semi-monthly drawing account . . . except the amounts provided in paragraph 7 hereof; that commissions on all sales made by defendant, or in which he participates, on and after the date of entry of interlocutory judgment herein shall be free of such restriction; that the court intends hereby to conserve the credit balance as of the date of entry of interlocutory judgment for the payment to defendant of semi-monthly drawing account of $700.00 before deductions or withholding for taxes to enable him to pay to plaintiff the alimony of $350.00 per month beginning September 1, 1945, herein found to be a reasonable sum to be awarded plaintiff, subject, however, to reduction of the said credit balance by chargebacks and offsets by Prentice-Hall, Inc., under its contract with defendant."

It was also found that if defendant committed adultery on or about April 24, 1943, said act was condoned; that for more than two years prior to the filing of the instant action, defendant was guilty of extreme cruelty toward plaintiff; and that

plaintiff was not guilty of extreme cruelty or any cruelty toward defendant, as alleged in the latter's cross-complaint.

By the interlocutory judgment of divorce, it was decreed that plaintiff was entitled to a divorce from defendant on her second cause of action, to wit: cruelty, and defendant was ordered to pay to plaintiff the sum of $350 per month for her support and maintenance, commencing September 1, 1945.

Said judgment divided the community property as follows:

"(a) That the home of the parties . . . together with the furniture, furnishings and fixtures therein, by this judgment is declared to be, and is plaintiff's sole and separate property . . . subject, however, to the lien of the first mortgage on said real property.

"(b) Plaintiff shall have right, title and interest as irrevocable beneficiary in and to the following life insurance policies: Aetna . . . $5,000.00; New York . . . $6,000.00, . . . subject to payment of premiums thereon by the plaintiff.

"(c) 1941 Chrysler Sedan to Plaintiff;

"(d) War Bonds of the face value of $1,200.00 to plaintiff;

"(e) *Defendant* shall have all right, title and interest in and to the following life insurance policies: New York . . . for $7,000.00; John Hancock . . . $1,000.00; Praetorians . . . $1,000.00 . . . as his sole and separate property;

"(f) Cash in banks in the sum of $2516.20; defendant's right to participate in the profit sharing plan of Prentice-Hall, Inc.; 20 shares of the Capital Stock of Prentice-Hall, Inc.; 1942 Ford Coupe; Defendant's interest in the Pension Plan of Prentice-Hall, Inc.; commissions standing on the books of Prentice-Hall, Inc., are awarded to the defendant as defendant's sole and separate property; that defendant is enjoined and restrained from withdrawing or causing to be withdrawn any sum or sums from said commission account designated 'Current Credit Balance' in the amount of that balance as of date of entry of this judgment except for the following purposes: To pay to the defendant semi-monthly drawing account of $700.00 paid by Prentice-Hall, Inc. To pay attorneys' fees of $1,808.00 to attorneys for plaintiff, and $1650.00 to attorney for defendant. To pay plaintiff's current obligations in the sum of $1,808.00. To pay any amount awarded to plaintiff for costs and attorney fees on appeal and the same amount allowed plaintiff as attorney fees to the defendant's attorney on appeal. . . .

"7. The custody of the minor child, John Alison Fahnestock, is awarded to plaintiff and defendant."

Recapitulation of the award of community property:

To Plaintiff:

| | |
|---|---|
| Home | $11,500.00 |
| Furnishings | 5,000.00 |
| Aetna Life Insurance Policy | 5,000.00 |
| New York Life Insurance Policy | 6,000.00 |
| War Bonds | 1,200.00 |
| Chrysler 1941 Sedan (no value set) | |
| | 28,700.00 |

To Defendant:

| | |
|---|---|
| New York Life Insurance Policy | 7,000.00 |
| Praetorians Insurance Policy | 1,000.00 |
| John Hancock (group insurance) | 1,000.00 |
| Cash in banks | 2,516.20 |
| Capital Stock P-H | 1,300.00 |
| Interest in P-H Pension Plan | 1,500.00 |
| Interest in P-H profit sharing plan (no value set) | |
| 1942 Ford Coupe (no value set) | |
| | 14,316.20 |

Current Credit Balance of $26,056, subject to chargebacks and offsets, was awarded to defendant, who was restrained from withdrawing any thereof, except his semi-monthly drawing of $700 (of which he was ordered to pay $350 per month alimony to plaintiff), and certain amounts hereinbefore recited, approximating $7,200.

Plaintiff appeals from that part of said interlocutory judgment which denies her a divorce on the ground of adultery; from that portion thereof which divides the community property between the parties; and from that part which awards the custody of the minor child to the parties jointly.

It is here claimed by appellant that the court erred in awarding her less than half of the community property and that she is entitled to more than half, as a matter of right.

With respect to the disposition of the community property of the parties to a divorce action, section 146 of the Civil Code provides as follows:

"One. If the decree be rendered on the ground of adultery, incurable insanity or extreme cruelty, the community property shall be assigned to the respective parties in such proportions

as the court, from all the facts of the case, and the conditions of the parties, may deem just.

"Two. If the decree be rendered on any other ground than that of adultery, incurable insanity or extreme cruelty, the community property shall be equally divided between the parties. . . ."

With respect to the division of community property in a divorce action, the court in *Crouch* v. *Crouch*, 63 Cal.App.2d 747, 756 [147 P.2d 678], stated as follows: "In an action for divorce upon the grounds of extreme cruelty, the trial court has the legal right to award such portion of the community property to the offending spouse as it deems reasonable under the circumstances. It may even deny such party any award whatever if, from the facts and circumstances of the case and conditions of the parties, it may deem such action just. In an action for divorce on the ground of extreme cruelty, subdivision 1 of section 146 of the Civil Code confers upon the trial court a wide latitude for the exercise of its judgment and discretion in assigning the community property to the respective parties and in every case it will be presumed that such discretion has been wisely and properly exercised, and though impliedly requiring that more than one-half of the community shall be awarded to the innocent party, it does not otherwise limit the discretion of the trial court in making the award. The proportion should depend upon the particular circumstances of each case, and where the trial court has exercised a legal discretion this court, though clothed with the power of revision under the statute, will be slow to interfere with that discretion."

In *Falk* v. *Falk*, 48 Cal.App.2d 762, 771 [120 P.2d 714], it was stated: "At least there are many decisions which have held that in the event of a divorce on the ground of either extreme cruelty or adultery, the innocent party is entitled to *more* than one-half of the community property. Assuming, without so deciding, that that is the established rule in California, there is still a sound discretion imposed upon the trial court to determine under all the facts and circumstances of the case, including the status of the respective parties and their needs, how much in excess of one-half of the community property shall be awarded to the innocent party. We have no disposition to interfere with that discretion of the court, even if we have the authority to do so."

As heretofore pointed out in the "Recapitulation of the

award of community property," the trial court in dividing the tangible community assets awarded to appellant *double the amount* thereof awarded to respondent, and in addition ordered respondent to pay to her $350 per month alimony. In awarding the current credit balance to respondent, the court obviously had in mind the protection of appellant, because it restrained respondent from withdrawing any of said credit balance, except his semi-monthly drawing account of $700, plus the sums provided in paragraph 7 of the findings, which totaled approximately $7,200, in order that a backlog might thereby be maintained out of which appellant's alimony payments could be made.

Appellant admits that the credit balance is subject to deductions, i. e., chargebacks, offsets and cancellations. However, neither respondent nor R. P. Ettinger, president of Prentice-Hall Inc., would venture to estimate the amount of such deductions. Mr. Ettinger testified: ". . . in the first place, there are a lot of rules under which a man operates in addition to what is in this memorandum. In the second place, it was understood that in case his credit balance was reduced below $7,500.00, that he would go on the standard drawing account plan of February 1, 1944, on which most of our men operate. Under that plan, if his credit balance went below $7,500.00, he would get $325.00 semi-monthly. If it went below $6,000.00, he would get $300.00 semi-monthly, and so it would be continuously reduced as his current credit balance is reduced to the figures shown on this standard drawing account plan. . . . The credit balance can be reduced by three things: 1. Payments to Fahnestock. 2. Bad debts. If an account isn't paid in a certain length of time, the commission on the account is charged back to Mr. Fahnestock. 3. Cancellations. If a customer cancels an order, the commission is charged back. Now, the way that happens, for example, is this: Fahnestock takes an order several months ahead of time, such as a renewal order on the Price Control or Regulatory Service. He may take the order in January for renewal to start in July or October. Now if, in July or October, the Price Control or the Regulatory Controls are relaxed or discontinued, the customer may cancel the order and the commission is charged back at the time of cancellation. . . . There is another way, yes. The Service itself might be discontinued. For example, if Price Control is discontinued completely, we could discontinue the Service, in which case the cancellation

would be initiated by us and the commission would be charged back to the salesman. Now if these war controls are abandoned, we would discontinue the Service covering them. *Mr. Schlesinger:* Why shouldn't you continue to pay $700.00 semi-monthly when the credit balance gets down to $7500.00? *Mr. Ettinger:* In the first place we agreed not to pay it to him. But the reason for that I think is best explained by looking at our original arrangements. Under our arrangements or agreements with the salesmen, the salesman is not entitled to any commission until the customer pays. Now formerly, back in 1943, we kept the current account of a salesman showing the NCUP (No Commission Until Paid) in one column and the straight commission, or the actual commission due a man, in another column. Now the salesman couldn't touch the amount in the NCUP column because that represented 'no commission until the customer paid.' . . . When the customer paid, it was transferred to the straight commission column. In order to simplify our record keeping, we combined the two columns. Actually, therefore, what is now in the straight commission column is a combination of a substantial amount of commissions that the salesman is not entitled to until the customer pays. Probably half of the amount of the $26,000 now shown in Mr. Fahnestock's 'Straight Commission' column represents what would have been NCUP and, therefore, represents what Mr. Fahnestock would not have been entitled to withdraw until the customer paid. In order to simplify matters, we combined everything in one column but required a 'cushion' in case a number of customers didn't pay.'' Mr. Ettinger stated that Mr. Fahnestock's credit balance at the end of 1943 and the beginning of 1944 ''was $12,788.00. . . . As of May 15, 1945, it was $26,056.00. . . . That credit balance may be reduced . . . due to payments to Fahnestock, bad debts, cancellations by the customers or discontinuance of the Service. Now, as a matter of fact, in the last few weeks Mr. Fahnestock's credit balance was actually reduced by approximately $600.00. The credit balance has gone up considerably in the last few years because of an abnormally large volume of business which, in my opinion, is due to the sale of a lot of the Services connected with the regulation of business due to the war and the credit balance can go down just like it went up. . . . We pay him a gross sum, out of which he pays his own travel and enter-

tainment and related expenses, including automobile, gasoline and so on. He also pays for a number of items he uses in the business or gives away to customers, such as the item of $110.00 . . . the payment for memorandum books produced by Prentice-Hall that Mr. Fahnestock purchased . . . to give away to his customers. . . . I would like to make available to all parties concerned, all information that would be helpful in working out an equitable solution to this problem. I think it would be a vital mistake for both Noel and Ethel to draw down any substantial part of the present credit balance. If this is done, next year or the year after, when business isn't as easy to get and when a number of subscribers may cancel the account, it would be altogether too close to the $7500.00 margin to permit of safety. I think everybody would be much better off if the present credit balance were kept as large as possible, so that there could be a continuation, for as long a time as possible, of the payment of the $700.00 semi-monthly. When you look at the records and see that Mr. Fahnestock's credit balance increased from some $12,-000.00 in December 1943 to $26,000.00 in May 1945—about a year and a half—it would appear that the account has benefited from a rather inflationary volume of business and that a reversal of this trend might put Mr. Fahnestock's account in a dangerous position, particularly if any substantial part of the credit balance were withdrawn at this time. The safe thing to do is to leave as much credit balance as you can, so that the $700.00 (semi) monthly payments can be continued as long as possible.''

From the foregoing, it is obvious that the withdrawal of $1,400 monthly and the $7,200 allowed by the court to be withdrawn for payment of attorneys' fees, etc., plus the inevitable chargebacks, offsets and cancellations to which Mr. Ettinger referred, would result in a reduction of the credit balance found to be $26,056 as of May 15, 1945, to a sum far below the $7,500 required to be maintained by respondent. Consequently, appellant was awarded more than half of the community property in a division which was eminently fair and just.

As stated in *Price* v. *Price*, 71 Cal.App.2d 734, 739 [163 P.2d 501], ''The law is established in California that community property may be awarded where a divorce is granted on the ground of extreme cruelty in such manner as the court

from all the facts of the case and the condition of the parties may deem just. (Civ. Code, § 146, subd. 1.)

"In the absence of a clear abuse of discretion this court is without authority to disturb the order of the trial court awarding the community property. In the instant case there is no showing that the trial court abused its discretion. Plaintiff received the sum of $2,500, while the defendant was awarded (a) furniture valued at $1,000, (b) trucks valued at $1,200, (c) a De Soto automobile worth $1,450, and (d) a milk route of undetermined value. It is evident the foregoing disposition of the community property was not unfair to either party."

■ Appellant urges that "the court erred in not finding there was adultery, and in not finding that the condonation had been revoked." While it is true that appellant testified regarding her charge of adultery, there was no corroboration of her testimony, as required by section 130 of the Civil Code. Also, under the provisions of section 2079 of the Code of Civil Procedure, respondent's admission of the charge of adultery was "not of itself sufficient to justify a judgment of divorce."

■ Appellant also contends that the joint custody of the minor son should "be set aside and the father be given the mere right of visitation."

"It is the settled rule that, in determining who should have custody of the minor children of the parties to divorce actions, a very broad discretion is vested in the trial courts. It is only when a clear case of abuse of said discretion is made out that this court will interfere with the determination of the trial court on appeal. (*Taber* v. *Taber*, 209 Cal. 755 [290 P. 36]; *Simmons* v. *Simmons*, 22 Cal.App. 448 [134 P. 791].)" *Prouty* v. *Prouty*, 16 Cal.2d 190, 191 [105 P.2d 295].

The minor child here involved was seventeen years of age when the divorce action was filed in August of 1944. In awarding joint custody of the boy, the trial court commented as follows:

"This boy is eighteen years old, and it won't be long before he is able to earn his own way. If he goes into the Naval Service, as I hope he will, Uncle Sam will take care of him, and that will leave the mother free." In the circumstances presented, there was no abuse of discretion by the trial court

in awarding the custody of the minor son to the parents jointly.

For the reasons stated, the portions of the judgment appealed from are affirmed.

Doran, J., and White, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 16, 1947. Traynor, J., voted for a hearing.