STATE BOARD OF EDUCATION v. COMMISSION OF FINANCE et al.

No. 7785.   Decided August 19, 1952.   (247 P. 2d 435.)

See 78 C. J. S., Schools and School Districts, sec. 87. Power to abolish or discontinue office, 42 Am. Jur., Public Officers, secs. 33-36; 37 A. L. R. 814.

*Clinton D. Vernon,* Atty. Gen., for plaintiff.

*Paul H. Ray, Albert R. Bowen,* Salt Lake City, for defendants.

WOLFE, Chief Justice.

This is an original proceeding to compel the Commission of Finance and the members thereof to issue warrants on the State Treasurer for the payment of salary claims of Dr. E. Allen Bateman who was appointed State Superintendent of Public Instruction by the State Board of Education on October 5, 1951. The Commission of Finance has refused to issue warrants on the ground that the State Board of Education was not lawfully constituted on October 5, 1951, and thus had no authority to make the appointment of Dr. Bateman.

Prior to November 5, 1950, the management of the public school system in this state was vested in an elective State Superintendent of Public Instruction and an appointive State Board of Education as will be seen by the following former provisions of our state constitution. Article X, Sec. 8, provided that:

"The general control and supervision of the Public School System shall be vested in a State Board of Education, consisting of the Superintendent of Public Instruction, and such other persons as the Legislature may provide."

By Sec. 75-7-1, Utah Code Annotated 1943, the Legislature had provided that the State Board of Education

"shall consist of the state superintendent of public instruction and nine other persons, appointed by seven regional school board conventions; * * *"

Article VII, Secs. 1, 10 and 20, provided:

Sec. 1

"The Executive Department shall consist of Governor, Secretary of State, State Auditor, State Treasurer, Attorney General, and Superintendent of Public Instruction, each of whom shall hold his office for four years, beginning on the first Monday of January next after his election, * * *"

## Sec. 10

"\* \* \* If the office of secretary of the state, state auditor, state treasurer, attorney-general or superintendent of public instruction be vacated by death, resignation or otherwise, it shall be the duty of the governor to fill the same by appointment, and the appointee shall hold his office until his successor shall be elected and qualified, as may be by law provided."

## Sec. 20

"The Governor, Secretary of State, Auditor, Treasurer, Attorney-General, Superintendent of Public Instruction and such other State and district officers as may be provided for by law, shall receive for their services monthly, a compensation as fixed by law. \* \* \*".

In 1949, the 28th Legislature adopted two Joint Resolutions proposing certain amendments to article X, Sec. 8 and Article VII, Secs. 1, 10 and 20. These proposed constitutional amendments were submitted to the electorate of this state and approved by them at the general election held November 5, 1950. The effect of the amendments, in general, was to vest the management of the public school system in an elective State Board of Education which was directed to appoint the Superintendent of Public Instruction. Specifically, Article X, Sec. 8 was amended to provide:

"The general control and supervision of the public school system shall be vested in a State Board of Education, the members of which shall be elected as provided by law.

"The Board shall appoint the State Superintendent of Public Instruction who shall be the executive officer of the Board."

The amendments to Article VII deleted in Section 1 the Superintendent of Public Instruction from the list of elective officers constituting the Executive Department; in Section 10, the office of Superintendent of Public Instruction was stricken from the list of offices to be filled by appointment by the Governor in the event of a vacancy therein; and in Section 20, the Superintendent of Public

Instruction was deleted from the list of officers whose compensation for their services must be fixed by law.

The Regular Session of the 29th Legislature, which convened on January 8, 1951, and adjourned sine die sixty days later, failed to enact any legislation to implement the approved constitutional amendment to Article X, Sec. 8. It will be observed that that amendment, in so far as it provides for the election of Board members, was not self-executing, but required the Legislature to provide by law the manner in which members of the Board should be elected. At the First Special Session of the same Legislature which met in June, 1951, the Governor called this omission to the attention of the Legislature and added to the agenda of the Special Session the matter of enacting such implementing legislation. During that special session Chapters 16 and 17, Laws of Utah 1951, First Special Session, were enacted. Chapter 16 amended Sec. 75-7-1, U. C. A. 1943, to provide that the

"state board of education shall consist of nine persons elected by qualified registered electors according to election districts",

which districts were given the same geographical boundaries as the seven judicial districts of the state, each election district bearing the same number as the judicial district with which it corresponds. Further, in Chap. 16, provision was made for the holding of conventions in each election district for the purpose of nominating candidates for membership on the Board and the election of Board members was provided to be conducted as a part of the general election but with separate ballots. There was directed the election of (a) one Board member in District No. 7 at the general election in November, 1951. [As will be hereafter pointed out, this was obviously a legislative error since general elections are held only in the even-numbered years] ; (b) three Board members in District No. 3 at the general election in November, 1952, and every six years thereafter; (c) one Board member in each of Districts Nos. 1, 4 and 6

at the general election in November, 1954, and every six years thereafter; and (d) one Board member in each of Districts Nos. 2, 5 and 7 at the general election in November, 1956, and every six years thereafter. Following the above schedule for electing Board members, the following provision was made in Chapter 16:

"The terms of office of the present members of the state board of education are continued until their successors are elected and qualify."

Also, Chapter 16 empowered the Board to appoint and fix the salary of the State Superintendent of Public Instruction "who shall be the executive officer of the Board."

Chapter 17, Laws of Utah 1951, First Special Session, amended Sec. 75-8-1, U. C. A. 1943, specifying the qualifications of the State Superintendent of Public Instruction, and provided that he should "serve at the pleasure of the Board."

Chapters 16 and 17 took effect on August 15, 1951, sixty days after the close of the Special Session in accordance with Art. VI, Sec. 25, Constitution of Utah. At a meeting of the State Board of Education on October 5, 1951, the Board appointed Dr. Bateman to the office of State Superintendent of Public Instruction and fixed his salary at $10,000 per annum. The Board of Examiners (composed of the Governor, Secretary of State and the Attorney General) which must approve all salary claims against the State, except those fixed by law, approved by a vote of two to one the request of the Board of Education to pay Dr. Batetman a salary of $10,000 per annum. Salary claims submitted for and on behalf of Dr. Bateman for the payroll period of October 1 to 15, 1951 and from October 16 to 31, 1951 were approved by the Board of Examiners by a vote of two to one, but the Commission of Finance refused to issue warrants on the State Treasurer in payment of said salary claims. No salary has been paid to Dr. Bateman since his appointment on October 5, 1951. In its answer to an alternative writ issued by this court on peti-

tion of the State Board of Education, the Commission of Finance and its members challenge the legality of the constituency of the Board of Education and the appointment of Dr. Bateman to the office of State Superintendent of Public Instruction.

At the general election in November, 1948, Dr. Bateman was elected Superintendent of Public Instruction for a term of four years. This was, of course, two years prior to the approval by the electorate of the constitutional amendments to Art. X, Sec. 8 and Art. VII, Secs. 1, 10 and 20, which changed the office from elective to appointive in character. The Joint Resolutions adopted by the Legislature in 1949 proposing the amendments specified that if the amendments to Art. VII, Secs. 1, 10 and 20 were approved by the electorate, they should take effect on January 1, 1951. (No provision was made in the Joint Resolutions for the effective date of the amendment to Art. X, Sec. 8 in the event of its approval by the electorate.) Thus when the amendments to Art. VII, Secs. 1, 10 and 20 were approved by the voters of this state at the general election held November 5, 1950, they accordingly became a part of the Constitution on January 1, 1951 and because they required no legislative implementation they had immediate operation. As heretofore stated, their effect was to delete the Superintendent of Public Instruction (1) from the list of elective officers constituting the Executive Department, (2) from the list of offices to be filled by appointment by the Governor in the event of a vacancy therein, and (3) from the list of officers whose compensation for their services must be fixed by law.

The defendants contend that the amendments abolished the office of Superintendent of Public Instruction as of January 1, 1951. With this contention we cannot agree. The amendments *terminated* the constitutional four year term of office to which Dr. Bateman had been elected in 1948, but did not abolish the office. That it was the intention of the amendments to cut short Dr. Bateman's term

of office is manifest from the fact that (1) the amendment to Art. VII, Sec. 1, which took effect on January 1, 1951, removed the Superintendent from the list of officers comprising the Executive Department "each of whom shall hold his office for four years", and (2) the Board of Education was given the power by the amendment to Art. X, Sec. 8 to appoint the Superintendent, without limitation as to when it could exercise that power. See *State ex rel. Richardson* v. *Ewing,* 17 Mo. 515. Had it been the intention of the amendments that Dr. Bateman should continue to serve out the four year term for which he had been elected in 1948, the effective date of the amendments to Art. VII should have been delayed until January 1, 1953, and the power of the Board to appoint the Superintendent made subject to the condition that it be not exercised until that date.

Clearly, there was no intention to abolish the office of Superintendent of Public Instruction. The amendment to Art. X, Sec. 8 provided for that office and directed that it be filled by appointment by the Board of Education. Inasmuch as the Joint Resolution proposing the amendment to Art. X, Sec. 8, made no provision for the effective date of that amendment, if approved by the electorate, it took effect on the date of its approval by the voters, viz. November 5, 1950. See *Snow* v. *Keddington,* 113 Utah 325, 195 P. 2d 234, wherein this court held that a constitutional amendment becomes effective on the date of its approval by the electorate unless provision is made for a later effective date. Therefore, there was at all times provision in the Constitution for the existence of the office of State Superintendent of Public Instruction. The amendments only changed the office from an elective office in the Executive Department to an appointive office under the Board of Education. But it remained a constitutional office with the same functions, duties and powers appertaining to it. *State ex rel. Hammond* v. *Maxfield,* 103 Utah 1, 132

P. 2d 660. It should be noted that none of the constitutional amendments changed Art. VII, Sec. 19, which provides,

"The Superintendent of Public Instruction shall perform such duties as may be provided by law",

nor did the amendments change Sec. 15 of the same article which directs that the Superintendent of Public Instruction shall be a member of the Board of Reform School Commissioners. Had it been the desire of the Legislature and the people to abolish the office of Superintendent of Public Instruction as a constitutional office, repeal of Secs. 15 and 19 would seem to have been necessary and proper.

Concluding then that the constitutional office of Superintendent of Public Instruction was not abolished by the taking effect of the amendments to Art. VII, Secs. 1, 10, 20, but that only Dr. Bateman's four year term to which he had been elected in 1948 was terminated, the question arises as to the status of Dr. Bateman from January 1, 1951 to October 5, 1951 when he was appointed Superintendent of Public Instruction by the Board of Education. As has been heretofore pointed out, the four year term to which he was elected in 1948 and which commenced on January 3, 1949, was terminated on January 1, 1951. After that date, Dr. Bateman was holding over until the appointment and qualification of his successor. While it is true that there was no constitutional provision which authorized such holding over, and Sec. 75-8-1, U. C. A. 1943, authorizing him to hold office for four years and "until his successor shall be elected and qualified" was repealed by implication by the amendments to Art. VII, Secs. 1, 10, 20 which took effect January 1, 1951, nevertheless this court held in *State ex rel. Stain* v. *Christensen*, 84 Utah 185, 35 P. 2d 775, that even in the absence of a constitutional or statutory provision authorizing an incumbent in office to hold over beyond his fixed term until his successor has been chosen and has qualified, an incumbent officer may so hold over. This rule, we de-

clared, is bottomed on the sound public policy of not permitting an office of trust created for the public good to cease operating for the lack of an office-holder.

Turning now to a consideration of the legality of the constituency of the State Board of Education on October 5, 1951, when it appointed Dr. Bateman to the office of State Superintendent of Public Instruction it has been seen that the amendment to Article X, Section 8, changed the Board from appointive to elective, and that this amendment took effect on November 5, 1950, the day of its approval by the electorate. However, as also pointed out, this amendment in so far as it provided for the election of the Board, was not self-executing, but required legislative implementation before it could have any practical operation. The amendment to Article X, Sec. 8, provided that members of the State Board of Education should be "elected as provided by law." It was not until June, 1951, that such implementing legislation was enacted. (Chaps. 16 and 17, Laws of Utah 1951, First Special Session). This legislation providing in detail the manner in which the election of Board members should be conducted took effect on August 15, 1951.

Since the provision of the amendment to Article X, Sec. 8, requiring the election of the Board was not self-executing, but required legislative implementation which was forthcoming on August 15, 1951, the question arises as to the status of the Board from November 5, 1950 to ■ such time as the Board can be elected according to the provisions of Chap. 16, Laws of Utah 1951, First Special Session. The answer is provided by the cases of *State ex rel. Richardson* v. *Ewing*, 17 Mo. 515; *State* v. *Scott*, 9 Ark. 270; and Opinion of the Justices, 3 Gray, Mass., 601. These cases hold that when a non-self-executing constitutional amendment changes the manner of filling a public office from appointment to election, the incumbent official continues to serve until the legislature provides for the election of his successor and the successor is elected and qualifies. In *State* v. *Scott*, supra, the office of circuit judge was made

elective by constitutional amendment. It had theretofore been filled by appointment by the General Assembly. The question arose whether the instant the amendment was ratified and engrafted on to the Constitution it ousted all the incumbents of the circuit bench, creating vacancies to be filled by the voters of each circuit as soon as the legislature should pass an act fixing the time and prescribing the manner of their election. In resolving the question, the court said:

"If the amendment so operated as to occasion a vacancy immediately upon its adoption, there being no express declaration to that effect, it can result alone from the fact that, in the transfer of the power of filling the office to the people of the several circuits, the entire foundation upon which the incumbent stood was overturned and utterly destroyed. How would such construction comport with the obvious sense of the terms used and the manifest intention of the framers of the instrument; or, in other words, would it be a fair and liberal interpretation, and such a one as would be calculated to promote the true objects of the grant? If the amendment will bear such a construction as to allow other provisions of the constitution to stand without doing violence to any, it is then clearly permissible to put such a construction upon it. If the intention was to create vacancies, is it not fair and reasonable to suppose that words would have been employed directly and emphatically declarative of that purpose, and that no room would have been left for doubt or construction? I apprehend that such would have been the case  *  *  *.  The mere amendment itself cannot be said in any possible view of the case to produce a vacancy in the office; for all that could be claimed under it would be a mere naked power to be called into life and action when it should please the legislature to pass a law fixing the time and prescribing the manner of putting it into operation. This is the strongest view that could be taken against the defendant, and this most clearly shows that it could not go into immediate operation  *  *  *.

"*  *  *  It may be insisted that an amendment to the constitution, like a legislative act, in the absence of any declaration as to the time when it shall go into operation, is presumed to have been intended to have immediate effect. To this my answer is, that such result does not, by any means follow, because the act of the Legislature is perfect and complete in itself; whereas, the amendment merely confers the power to do an act, but that power cannot, by any possi-

bility, be exerted until it should have received shape and mould by an exercise of legislative authority."

Similarly, in the Opinion of the Justices, supra, the "Executive Council" which had previously been appointive, was made elective by constitutional amendment. The justices advised that the adoption of the amendment did not immediately create any vacancies on the council, but that the amendment could not come "practically into operation" until the legislature, as directed by the constitutional amendment, divided the Commonwealth into districts to enable the election of councilors.

. In *State ex rel. Richardson* v. *Ewing,* supra, a constitutional amendment directed that the Secretary of State, theretofore appointed to office, should be elected by the qualified voters "at such time and in such manner as may be provided by law; *   *   *"  In regards to the effect of the amendment on the incumbent in office the court said:

"Under it [the amendment], the duty was imposed upon the general assembly to provide for the election of a secretary by the voters of the state; and when such provision was made and a person was duly elected to the office, then there would be a secretary of state elected, as the constitution required. In the meantime, before such election, the office existed, and the then present incumbent was not disturbed in his right to it by the terms of the amendment. The office under the amendment, is the same office that existed before. As the amendment contemplated legislation for the purpose of electing a person to hold the office, and as the time at which such election should be held was left entirely to the discretion of the legislature, it would be a forced construction of the amendment to make it continue the office in being, and still render it vacant *   *   *. It is but a reasonable interpretation of the amendment to say that, by implication from its own terms, it continued the incumbent in office until a secretary should be elected under the amendment. It speaks in the fuure; 'there shall be a secretary of state, who shall be elected.' Until such secretary is elected, it is implied that the officer in possession of the office shall continue to possess it."

In the instant case, the language of the amendment to Art. X, Sec. 8 is prospective. It says "members of

[the Board] shall be elected as provided by law." There is nothing in the amendment which suggests that incumbents should be disturbed in office before the election and qualification of their successors.

It is pointed out in the brief for the Board of Education that before members of the Board will be elected from Election Districts Nos. 4 and 7 pursuant to the provisions of Chap. 16, the terms for which the incumbent members from those districts were appointed will have expired. In those instances, the incumbent appointive members are entitled to hold over after the expiration of their terms until the election and qualification of their successors. *State ex rel. Stain* v. *Christensen,* supra. Thus we conclude that the taking effect of the amendment to Article X, Section 8, on November 5, 1950, did not create any vacancies on the Board. The provision of Chap. 16 that

"the terms of office of the present members of the state board of education are continued until their successors are elected and qualify"

was merely a legislative recognition of the intent of the amendment and was, in fact, superfluous. Contrary to the defendants' contention, the Legislature was not by enacting that provision making appointments to fill vacancies in newly created offices—a prerogative which admittedly does not belong to the Legislature. The offices of members of the Board as they now exist and have existed since the adoption of the amendment to Art. X, Sec. 8 and the enactment of Chap. 16 are the identical offices which existed prior to the adoption of the amendment. True, by the amendment and Chap. 16 membership was changed from appointive to elective, and Chap. 16 reduced the term of office from seven to six years. But these changes did not create new offices. In *State ex rel. Hammond* v. *Maxfield,* 103 Utah 1, 132 P. 2d 660, 663, this court stated that in order to determine whether a new office is in fact created, reference must be had to the "functions, duties and powers which appertain to it." Only when the so-called new office has

substantially new, different or additional functions, duties and powers which the "old" office did not possess, is there in fact the creation of a new office. The only additional power which the Board was given was the power to appoint the Superintendent of Public Instruction and fix his salary. It cannot be said that conferring this additional power on the Board made new offices out of old ones.

We are now brought down to the primary contention of the defendants. They argue that even if it be conceded that the appointive incumbent members of the Board were not disturbed in their office by the taking effect of the amendment to Article X, Sec. 8, they are entitled to remain in office only until the "timely election" of their successors and that the provisions of Chap. 16 by which the election of the entire nine-man Board will not be complete until the general election of 1956 do not assure a "timely election" but, on the contrary, constitute an unconstitutional and unreasonable restraint upon the right of suffrage. The defendant urges that the Legislature should have:

"* * * promptly provided for an election forthwith of the entire Board of Education. It could have provided for different tenures for the several members [of the Board] so that in the future the entire membership would not be subject to change at any one election. In such manner the determination of the people to elect the Board of Education would not have been defeated by unreasonable delay and suspension."

As pointed out earlier in this opinion, Chap. 16 did not provide for the election of the entire membership of the Board at the next general election. Instead, provision was made for the election of one Board member in District No. 7 at the general election in November, 1951 (sic); three Board members in District No. 3 at the general election in November, 1952, and every six years thereafter; one Board member in each of Districts Nos. 1, 4 and 6 at the general election in 1954 and every six years thereafter; and one Board member in each of Districts Nos. 2, 5 and 7 at the general election in November, 1956, and every six years

thereafter. The terms of office of incumbent members of the Board were extended by Chap. 16 "until their successors are elected and qualify."

As an aside, it is well to note here before proceeding to discuss the above stated contention of the defendants, that the provision of Chap. 16 directing the election of one Board member in District No. 7 at the general election in November "1951" was obviously an inadvertence on ▮▮▮ the part of the Legislature. General elections are held in this state only in the even-numbered years. No general election was held in November, 1951. This legislative error resulted from a series of amendments being made to House Bill No. 9 (which became Chap. 16 after its enactment into law). H. B. No. 9 originally provided for the election of the full membership of the Board at a special election to be held on the first Wednesday in December, 1951. Later, when the Legislature resolved to elect Board members at the general elections, it neglected to delete all reference to a 1951 election. That the provision for the election of a Board member in District No. 7 in 1951 is inconsistent with the remainder of the provisions of Chap. 16 is seen by the fact that a member elected in 1951 would serve only *five* years since the election of a Board member in District No. 7 is again directed in 1956. Yet Chap. 16 specifies that members of the Board should serve for six years. Furthermore, no convention to nominate candidates for membership on the Board was provided to be held in District No. 7 in 1951, although conventions were scheduled to be held in the other election districts in the years in which the election of a Board member will occur. The Attorney General urges, and the defendants do not contend otherwise that when the

"words of a statute are so meaningless or inconsistent with the intention of the legislature otherwise plainly expressed in the statute * * * they may be rejected as surplusage, and omitted, eliminated, or disregarded." 50 Am. Jur. 219.

Accordingly, we will hereafter in this opinion ignore the provision for the election of a Board member in District No. 7 in 1951.

Returning now to a consideration of the objection raised against Chap. 16 by the defendants, it is clear that following the approval of the constitutional amendments on November 5, 1950, by the electorate, the Legislature was under a duty to provide for the election of Board members. No complaint is made by the defendants that the Legislature delayed in acting. As we have seen, the defendants' complaint is that the manner in which the Legislature provided for the election of the membership of the Board unreasonably delays the election of the full membership of the Board, thereby unnecessarily prolonging the tenure of incumbent appointive members of the Board and infringing upon the right of the electorate to elect the Board. Thus the question is presented whether the Legislature, when directed by a constitutional amendment to provide by law the time and the manner of the election of a board of public officers which theretofore has been appointive, works an unreasonable restraint upon the right of suffrage if it spreads the election of the entire board over the next three succeeding general elections. Must the Legislature when it acts as directed by a constitutional amendment makes provision for a more immediate election of the entire board?

A perusal of the Senate and House of Representative Journals of the First Special Session held in June, 1951, when Chap. 16 was enacted, reveals that bills providing for the election of Board members at times other than at general elections were introduced and considered by the Legislature. However, as was its prerogative, it resolved to elect members of the Board at general elections. Having made that determination, the first opportunity presented to elect any Board member would be at the general election in November, 1952. At the election, the Legislature directed the election of three Board members, all from the same election district. The remaining six members of the Board

from the other six election districts were provided to be elected at the next two succeeding general elections, viz., in 1954 and 1956.

One of the earliest and leading cases in this country on the subject of the power of the legislature to postpone elections is *Jordan* v. *Bailey,* 37 Minn. 174, 33 N. W. 778, 780. In that case, the court held that a constitutional provision requiring certain public officers to be elected was satisfied

"\* \* \* if provision was made by law for the election of such officers at stated periods, unless these periods are fixed at times so far remote from each other as to raise the presumption of a design substantially to deprive these offices of their elective character."

In *Wilson* v. *Clark,* 63 Kan. 505, 65 P. 705, 707, in order to secure uniformity in the commencement and ending of the terms of county and judicial officers, a statute was enacted postponing for one year the election of certain county and judicial officers whose terms expired presently. The court relying upon *Jordan* v. *Bailey,* supra, and other authorities, declared:

"The policy of the statute \* \* \* is to secure uniformity in the beginning of official terms, and also to avoid the expense, agitation, and other disadvantages of frequent elections. The postponement of elections for one year is a reasonable, and, in fact, the only practicable, method of accomplishing the beneficial purpose of the legislature. If the legislature had postponed elections an unreasonable length of time, longer than was necessary to effect the avowed purpose, and so long as to betray an intention to make the offices appointive by preventing the people from choosing their officers at stated intervals and for regular terms; or if it appeared that it was done merely to extend official terms, and as a favor to incumbents of offices,—there might be occasion for judicial interference and condemnation."

*Jordan* v. *Bailey,* supra, has also been cited with approval and followed in *Murray* v. *Payne,* 137 Kan. 685, 21 P. 2d 333; *Wayt* v. *Glasgow,* 106 Va. 110, 55 S. E. 536; *Common Council of Detroit* v. *Schmidt,* 128 Mich. 379, 87 N. W. 383;

*State* v. *Menaugh,* 151 Ind. 260, 51 N. E. 117, 43 L. R. A. 408, 418; and *O'Laughlin* v. *Carlson,* 30 N. D. 213, 152 N. W. 675.

In the instant case, the Legislature has not postponed the election of a public officer from the date upon which it would have normally been held (usually just prior to the expiration of the term of the incumbent) to a later date, as was done in the cases cited above, but has in initiating the election of a board of nine officers deferred from the earliest date when they could have been elected, the election of three members for two years and another three members for four years. However, the situations are analogous and the principles enunciated in those cases should govern in the case at bar.

When the Legislature decided that the Board should be composed of nine members, elected at general elections for terms of six years, and that the terms of all members of the Board should not expire in any one year, it was confronted with the task of fitting those features into a plan to initiate the election of members of the Board. Two alternatives were open. Provision could have been made for the election of all nine members at the next general election, with three members of the Board being elected for six year terms, three members for four year terms and three members for two year terms. After the expiration of the initial terms, all Board members would thereafter be elected for six year terms. The other alternative for the Legislature to follow was to elect three Board members in 1952, three in 1954 and three in 1956,—all for six year terms. While we do not know with certainty what reasons prompted it to adopt the latter alternative, it is reasonable to believe that its choice was influenced by the fact that the election of the entire Board in 1952 would necessitate the holding of a nominating convention and an election in each of the seven election districts of the state in that year, only to repeat the same process in two years or four years in many of the districts. It is well to point

out here that the conventions at which candidates seeking membership on the Board are nominated are special non-partisan conventions held exclusively for that purpose. Candidates for other public offices are nominated at the several conventions of the political parties. Also, that while the election of members of the Board is conducted as a part of the regular general elections held biennially in this state, separate non-partisan ballots are provided exclusively for candidates seeking positions on the Board. Adopting the plan which it did, the Legislature obviated the holding of conventions and elections for terms for less than six years in at least four districts. There is nothing in the plan followed which raises the "presumption of a design substantially to deprive [the Board of its] elective character." *Jordan* v. *Bailey,* supra. Chap. 16 embraces an orderly plan. No general elections were skipped over. The fact that the adoption of an alternative plan would have brought about the more immediate election of the entire membership of the Board, at the expense of the resulting frequency of expensive conventions and elections in many districts, does not demonstrate that the Legislature acted without the bounds of their discretion in such matters. In *Common Council of Detroit* v. *Schmidt,* supra, the Supreme Court of Michigan gave judicial approval to a statute which abolished annual city elections in the city of Detroit in favor of biennial city elections. Officials whose terms expired before the first biennial election was held were allowed to "hold over" until the election and qualification of their successors. It was there contended that if the legislature fixes the time for holding an election after the expiration of the terms of incumbent officers, it must provide for the holding of an interim election of officers for the time intervening between the expiration of the terms of the incumbent officers and the first biennial election. The court rejected that contention, stating that [128 Mich. 379, 87 N. W. 388]:

"In the present case the period fixed for holding the election continues the incumbents in office * * * one year. This is not unreasonable, especially as it saves the city of Detroit the expense of an election in November, 1901, and the spring of 1902, and places the election at times when the general state elections are to be held."

In *Wilson* v. *Clark* and *Murray* v. *Payne,* supra, the legislature postponed elections for the purpose of securing uniformity in the commencement and ending of terms of certain public officers. We recognized in *Snow* v. *Keddington,* supra, the desirability of such uniformity. In the instant case, the legislature has deferred elections for the opposite reason—to stagger the commencement and expiration of the terms of the several members of the Board. Both are meritorious purposes, depending upon the circumstances. If the sanction of the courts is given to the postponing of elections to accomplish the former purpose, judicial approval should not be withheld from a plan to accomplish the latter purpose. It should be borne in mind that we have a duty to uphold legislative acts unless we are convinced beyond a reasonable doubt that they are unconstitutional.

Cases have been cited eralier in this opinion where elections have been postponed for periods of time ranging from several months to three and one-half years. In the instant case the election of three Board members was deferred for two years and of the election of another three members was deferred four years. The length of the postptonement or deferral is not alone decisive of the reasonableness of the continuance. A postponement for one year might in some circumstances be unreasonable. We have heretofore shown how the deferral of elections for two and four years in the instant case was necessary to accomplish the purposes of the Legislature and at the same time avoid the necessity of setting up special machinery for nominating and electing Board members who would serve for only two or four years.

Thus we conclude that (1) Chap. 16, Laws of Utah 1951, First Special Session, providing for the election of the Board according to the schedule there set forth is not an unreasonable restraint upon the right of suffrage, but is a valid exercise of the power of the Legislature to provide for the holding of elections; (2) the incumbent appointive members of the Board are entitled to serve until the election and qualification of their successors; (3) the Board was therefore lawfully constituted on October 5, 1951, when it appointed Dr. Bateman to the office of Superintendent of Public Instruction and fixed his salaary at $10,000 per annum; (4) Dr. Bateman having been "holding over" in office since January 1, 1951, when the four year term to which he was elected in 1948 was terminated, was eligible, if otherwise qualified, for the appointment.

Peremptory writ ordered.

McDONOUGH, J., concurs.

WADE, Justice (concurring).

I have difficulty in finding that the people by these constitutional amendments or the legislature by the implementing statutes intended to terminate Dr. Bateman's term of office. Whether such is the effect in my opinion depends on the intent with which these provisions were adopted. We should not hold lightly that a definite term of office has been terminated. In *State* v. *Maxfield,* 103 Utah 1, 132 P. 2d 660, we held that without a legitimate purpose other than to depose an officer this could not be accomplished. The fact that Dr. Bateman was appointed to succeed himself clearly shows that there was no illegitimate subterfuge in these enactments to remove him from office before the expiration of his term but still I believe that where, as here, the enactments fail to expressly provide whether such term of office is terminated or not in the absence of something inconsistent with the continuation of

the term of office to its expiration, we should hold that such term is not terminated.

I do not question the power of the people by these amendments or of the legislature in activating them to terminate this term of office. But I doubt that it follows as a matter of course from the adoption of the constitutional amendments that such was their effect.

No doubt the object of these amendments was to take the choice of the Superintendent of Public Instruction out of politcis and from the electorate and place it in the Board of Education in the interest of efficiency. The accomplishment of this purpose does not seem to require the immediate termination of this term of office. But the legislature in implementing these amendments went further and expressly provided that the

"State Board of Education shall appoint a Superintendent of Public Instruction, * * * *who shall serve at the pleasure of the Board."* (Italics mine.)

This gives the Board a greater and more immediate control over the Superintendent, and does away with any definite term of office. This indicates an intention that the Board should have the power to place and keep in office a Superintendent acceptable to the Board. Such power is inconsistent with the continuation of Dr. Bateman's term of office to the end of the term to which he was elected. On this basis I concur with the prevailing opinion.

CROCKETT, Justice (concurring).

I concur.

It is indisputable that Dr. Bateman is in fact the Superintendent of Public Instruction and is performing the duties of that office. That is so, whether by appointment of the newly created board, or continuing under his elected term.

If the new board had appointed someone else, and Dr. Bateman were now claiming the office on the ground that

his elected term had not been terminated, we would have been confronted squarely with that problem. Under the existing facts, it seems unnecessary to determine whether his elected term was terminated.

I expressly agree with that portion of the main opinion which holds that the present Board of Education was lawfully established. Since its creation by constitutional amendment, it has been the only authority having power to fix the salary of the Superintendent of Public Instruction, which it has done in accordance with lawfully conferred prerogatives. I, therefore, concur in the decision of the Court except that I reserve opinion concerning the termination of Dr. Bateman's elected term.

HENRIOD, J., having disqualified himself, does not participate herein.