322 P.2d 381

E. Allen BATEMAN and State Board of Education, Plaintiffs and Respondents,

v.

BOARD OF EXAMINERS OF the STATE OF UTAH, Defendants and Appellants.

No. 8457.

Supreme Court of Utah.

Feb. 28, 1958.

E. R. Callister, Atty. Gen., H. R. Waldo, Jr., Asst. Atty. Gen., for appellants.

Richards & Bird and Dan S. Bushnell, Salt Lake City, for respondents.

CROCKETT, Justice.

This case arose originally as a suit for declaratory judgment by the University of Utah against the State Board of Examiners and the State Finance Commission. The dispute between the University and those defendants was dealt with in a prior opinion.[1] The State Board of Education intervened to determine its rights relating to both the University and the defendants, the issues between the University and the Board of Education have been resolved by stipulation. There is no dissonance between the Board of Examiners and the Commission of Finance in this action. Their interests being parallel, for the purpose of this decision, we will proceed upon the assumption that the Commission of Finance is the statutorily created administrative arm of the Board of Examiners and consider the rights of the Board of Education relative to it. These parties are hereinafter for brevity referred to simply as "Examiners" and "Education."

Reduced to its simplest terms the dispute is this: Education claims authority to administer the State Department of Education and school system without let or hindrance from Examiners; whereas the latter Board claims authority to examine and approve or disapprove of proposed expenditures, and to exercise general supervisory control of salaries and personnel practices of the Board of Education.[2]

Both parties advance plausible arguments in support of their claims to authority based on their respective constitutional origins and legislative implementation. Resolution of the problems presented will be facilitated by examining the constitutional foundation and the statutory structure of the authority of each separately.

The constitutional authority of Education is found in Article X which provides for the establishment of a uniform system of public schools within the state, defines of what it shall be comprised, and in Sec-

---

1. U. of Utah v. Board of Exrs., 4 Utah 2d 408, 295 P.2d 348.
2. Education sets out a list of instances in which it contends that Examiners, Finance or the Governor have interfered with its functions by refusing to make available appropriated funds; approve appointments of employees and proposed salaries.

tion 8 thereof vests "general control and supervision of the Public School System * * * in a State Board of Education, consisting of the Superintendent of Public Instruction, and such other persons as the Legislature may provide. * * * "

The language of Article X sheds little light as to just how the authority of Education should relate to Examiners or to other state departments, nor can any help be found from the proceedings of the Constitutional Convention, as there is no indication that the matter was ever considered or discussed. However, there was rather extensive discussion as to whether the Superintendent of Public Instruction should be an elective or an appointive position. Considerable sentiment was expressed as to the undesirability of having it directly responsive to political pressures.[3] This attitude reflected in the statement of Delegate Carl G. Maeser, who said, "I would like to see that office removed as far as possible away from politics."[4] The important responsibilities and the necessity of high qualifications of the superintendent were also stressed,[5] and it is also true that there was no suggestion or intimation that the superintendent or the

Board of Education might be subject to the control of Examiners.

The general purpose thus stated in the Constitution of establishing and maintaining a public school system is implemented in statutes which quite fully set forth the powers and duties of the superintendent and of the Board of Education.

Section 53-3-2 provides in part as follows:

"The state board of education shall be charged with the administration of the system of public instruction, and with general superintendence of the district schools of the state and of the school revenue set apart and appropriated for their support. * * * "

Section 53-3-7 provides:

"The state superintendent with the approval of the state board of education shall prepare and submit to the governor to be included in his budget to be submitted to the legislature, a budget of the requirements of his office including the expenses of the state board of education, for his own and other salaries and wages, office and travel expense, equipment and repairs

3. Vol. I Proc.Const.Conv. 659 et seq. (1895).
4. Ibid. p. 661.
5. Ibid. p. 1154, Delegate Kerr urged: "I submit, Mr. President, that the * * * Superintendent of Public Instruction should be a man of learning, * * *

who has spent years and a great amount of money in preparing * * *. It is not like the * * * office of Governor, which requires little or no preparation, (laughter) and can be filled by a man of ordinary ability."

necessary for carrying out the duties imposed upon the superintendent of public instruction and the state board of education * * *." · ·

Section 53-3-8 provides:

"The state auditor shall transfer to the state general fund from the uniform school fund to the credit of the state board of education the amount designated by the legislature for the operation of the office of the state superintendent and the state board of education, * * *."

Section 53-2-8 gives the Superintendent authority to appoint subordinates and fix their salaries:

"The board may appoint such assistant superintendents, directors, supervisors, assistants, clerical workers, and other employees, as in the judgment of the board may be necessary to the proper administration and supervision of the public school system. *The salaries* of such assistant superintendents, directors, supervisors, assistants, clerical workers and other employees, *shall be fixed by the board and shall be paid from money appropriated for that purpose.*" (Emphasis supplied.)

If the above statutes and constitutional provisions stood alone and could be given literal application, there would be no difficulty in determining the scope of the powers of Education. However, when we look at the over-all picture of our law, difficulty is encountered because, as will be seen, these powers are overlapped by others conferred upon Examiners.[6]

The Board of Examiners was created by and its authority is rooted in Section 13, Article VII of our Constitution which provides:

"Until otherwise provided by law, the Governor, Secretary of State and Attorney-General shall constitute a Board of State Prison Commissioners, * * *. [specifies duties] They shall, also, constitute a Board of Examiners, with power to examine all claims against the State except salaries or compensation of officers fixed by law, and perform such other duties as may be prescribed by law; and no claim against the State, except for salaries and compensation of officers fixed by law, shall be passed upon by the Legislature without having been considered and acted upon by the said Board of Examiners."

The question of importance is the extent of the authority conferred by the language, " * * * with power to examine all claims against the state." This phraseology has given rise to much concern over the re-

---

6. For an excellent article on the powers of Examiners see Article by James W. Rawlings, 5 Utah Law Review 349.

ciprocal powers and interrelationships of the departments of our state government. In the first place, we think that the word "*claim*" was used in its broadest connotation and we recognize that it is susceptible of a variety of meanings: ranging from a moral claim; or the seeking of legislative largesse; or asserting a privilege; to asserting rights to compensation for property or materials furnished, or salary for services rendered, to the state. But the pivot of the controversy has devolved upon the term "to examine." On the one hand, Education espouses the view that the power "to examine all claims against the state" merely denotes an auditing function; and on the other, Examiners takes the position that it confers plenary power to examine into the advisability and necessity of any expenditure or proposed obligation of the state.

The first facet of Education's argument against the power claimed by Examiners is that the framers of the Constitution envisioned Section 13, above quoted, as legislative in nature, intended to be subsequently modified and controlled by legislative enactments such as the statutes conferring powers on Education. They emphasize that such was the plain import of its first clause, "Until otherwise provided by law, * * *" which they insist modified the entire section. Without going into the detail of the arguments pro and con on this facet of the subject it is readily seen that attempting to give that proviso application to each of the subsequent parts of the section gives rise to some difficulty grammatically. I. e. it would read: "Until otherwise provided by law, * * * [they shall] * * * perform such other duties as may be prescribed by law." Absent knowledge of the facts concerning its adoption, the most natural meaning would be that it applies only to the first sentence dealing with the membership of the Board of State Prison Commissioners, and by parallel reasoning, to the second sentence relating only to the membership of the Board of Examiners.

Education points to the constitutional convention in support of its reasoning that the entire section was intended to be subject to future legislation. Sections 12 through 15 establish various administrative agencies: Section 12, the Board of Pardons; Section 13, the State Prison Commissioners and Board of Examiners; Section 14, Insane Asylum Commissioners; Section 15, Reform School Commissioners. At the Convention, a motion was made to strike all of the sections on the theory that they dealt with legislative matters. During subsequent debates, in which section 12 was most often mentioned, delegate Thurman observed:

"I do not see why this matter cannot be left to the Legislature. Of course, this leaves the matter where it is now, but it gives to the Legislature the right to create a board such as is here

named, or any other kind of a board of pardons. * * *

"Mr. Varian. Mr. Chairman, taking the propositions in their order, I would suggest, in speaking to the substitute offered by my friend from Utah County, that there is no reason why we should not leave it to the Legislature. * * *" [7]

and at the final reading, first Section 12 and then Sections 13, 14 and 15, were each amended by inserting at the beginning thereof the phrase: "Until otherwise provided by law." [8] Thus the manner in which the initial proviso of the section was adopted is somewhat persuasive that the whole section was intended to be applied and interpreted in accordance with subsequent legislative enactments.

■ The idea that the boards themselves were to be subject to change by the Legislature also finds support in the practical construction which has been placed upon it. The membership of all of the other boards provided for in the sections just referred to has now been changed.[9] A conclusion that the initial clause affects the entire section would not cast the die in favor of Education any more than it would in favor of Ex-

aminers, as will appear from our discussion of the statutes relating to the powers of the latter board. Yet it does have an important bearing on the over-all conclusion we reach in this opinion, which is based to a considerable extent upon the concept that the fundamental power of government rests in the legislature.[10]

Another argument of Education against the claim to general supervisory powers asserted by Examiners is that the concluding clause of the section of the Constitution in question, " * * * and no claim against the state, except for salaries and compensation of officers fixed by law, shall be passed upon by the legislature without having been considered and acted upon by the State Board of Examiners" characterizes the entire section, showing an intent that they should pass only upon unliquidated claims against the state. Certain it is that one of the functions of Examiners is to investigate and act as a fact finder and advisor to the legislature on claims of that nature, such as tort claims, or other claims for damages or compensation claimed for property, goods or services, by persons who would not otherwise have legal redress available.

7. II Proceedings Const.Conv.1895 p. 1008.
8. Ibid pp. 1152 et seq.
9. Sections 77–62–2, 77–62–3, U.C.A.1953 modify Article 7, Section 12; Section 64–9–1, U.C.A.1953, modifies Article 7, Section 13 insofar as the Board of Prison Commissioners in concerned. Section 64–7–2, U.C.A.1953 modifies Article 7, Section 14; and Sections 64–6–1 and 64–6–2, U.C.A.1953 modify Article 7, Section 15.
10. See Parkinson v. Watson, 4 Utah 2d 191, 291 P.2d 400.

■ One of the major difficulties with Education's contention that, except as to unliquidated claims against the state, Examiners has no discretionary authority and can perform only an auditing function, is that that would be but a duplication of the duties of the state auditor who is charged with the responsibility of auditing the records and accounts of all departments of state government.[11] The question as to the extent of the power of Examiners has been dealt with by this court in numerous decisions. They clearly demonstrate that Examiners has powers beyond mere auditing.

One of the earliest cases dealing with the problem of the authority of Examiners was Thoreson v. State Board of Examiners.[12] Mandamus was sought to direct Examiners to audit and allow an unpaid balance for the lease of school lands. The statute provided:

> "The state board of examiners are hereby directed to receive and audit and allow all just claims of persons who have paid monies in pursuance of chapter 76 of the Session Laws of the territory of Utah of eighteen hundred and ninety-two, in relation to the leases of school lands and the state auditor is hereby directed to draw his warrant therefor on the state district school tax fund."

The provision of the 1892 Session Laws which had authorized leasing of school lands had been held unconstitutional[13] and the statute was purposed to reimburse people for money advanced on such leases. The court took occasion to observe that Examiners is more than a perfunctory body, and may exercise discretion, but held that under the statute the amount paid in was a "just claim" and therefore the only determination for Examiners to make was whether the amount of money claimed had actually been paid in and was under a mandatory duty to authorize payment of the amount.

The next case dealing with the scope of Examiners' authority was Marioneaux v. Cutler.[14] A district judge brought mandamus against Examiners for approval of his claim for a mileage which they had rejected. The refusal had been justified on the ground that the law authorizing the same was unconstitutional as containing more than one subject which position was sustained. This case is relied upon as authority for the discretionary power of Examiners but it is to be noted that the holding, if strictly limited to the facts, says only that they are not required to approve the payment of a claim which is not properly grounded under the law. The question

---

11. Sec. 16, Art. VII, Constitution; Secs. 67–3–1 et seq., U.C.A.1953.
12. 1900, 21 Utah 187, 60 P. 982.

13. Burrows v. Kimball, 11 Utah 149, 41 P. 719.
14. 1907, 32 Utah 475, 91 P. 355.

of their discretion beyond that was not precisely involved.

This case was followed by State ex rel. Davis v. Edwards [15] wherein a court reporter sought to compel the State Auditor to allow his claim for mileage which the district judge had certified as correct. The statute stated that upon such certification by the judge and presentation of the certificate to the Auditor a warrant should be drawn for payment. In spite of this statute the Auditor refused, relying on Sec. 18, Ch. 35, L. 1896 which required approval of Examiners before he could draw the warrant. The court held that the claim must be presented to Examiners for approval as required by the statute and used some very pointed language pertinent to the instant problem:

> "*The powers conferred upon the board of examiners*, with regard to claims against the state, by the constitutional provision quoted above, *are general and sweeping. The power would include all claims against the state*, were it not for the exception which excludes salaries or compensation of officers fixed by law. An exception of this character may not be enlarged nor extended by implication. An exception which specifies the things that are excepted from a general pro-

vision strengthens the force of the general provisions of the law." (Emphasis added.)

While it might be said that the case could have been based upon the express provisions of the statute involved, yet it indicated the conception the court had of the law and the trend of its development in recognizing a discretionary power in the Board of Examiners in passing on claims against the state.

That same year in State ex rel. Davis v. Cutler [16] the question of Examiners' discretionary power was judicially appraised from a slightly different angle. Another court stenographer brought mandamus to compel the Auditor to allow a claim which had been rejected by Examiners. The court again opined that Examiners may exercise discretion in allowance of claims but must not do so arbitrarily and that, if the claim, " * * * is one which is admitted to be just, and is authorized by law, and there is no dispute with regard to any fact involved, and the claim is presented to the board in due form as the law requires, we know of no law nor reason why respondents [Examiners], although acting in a quasi-judicial capacity, should not be required to audit and allow the claim." [17] The actual holding was that Examiners had improperly refused to act, and thus the ob-

---

15. 1908, 33 Utah 243, 93 P. 720.
16. 1908, 34 Utah 99, 95 P. 1071.

17. Ibid., at page 1074 of 95 P.

servations relating to its discretionary powers were by way of dicta. But even so, there was another clear expression of the view the court took of the law respecting the discretionary powers of Examiners.

The landmark case on this subject is that of Uintah State Bank v. Ajax.[18] Action was brought to compel the State Auditor to issue warrants to pay bounty certificates for killing predatory animals (coyotes). The plaintiff contended that inasmuch as the statute fixed the amount to be paid for each animal killed and directed the Auditor to issue the warrant upon the certificate of the County Clerk, and further that nothing in the act required submission of the claims to Examiners, the Auditor must issue the warrant upon presentation of the certificate. The bank argued that the amount having been thus "fixed by law," there was nothing but the ministerial duty of paying the claim and hence it was unnecessary to present it to Examiners. This contention was rejected by the court, saying:

"The claims here are not fixed by law in the sense that the Legislature has made an appropriation of an amount certain to a definite named person."

and further;

"all claims are subject to action by the board of examiners except only claims for 'salaries and compensation of officers fixed by law.'"

It refused to agree that Examiners should examine only "unliquidated" claims against the state, using the following language:

"If we should adopt petitioner's view, it would follow that the legislature might designate any officer other than the board of examiners as authorized in behalf of the state to settle, fix, or liquidate claims and agree upon the amount to be paid thereon, and thereby exclude the board of examiners from its duty * * *. We cannot agree to any such construction of the constitutional language, nor may we by construction interpolate the word 'unliquidated' into the Constitution [which] * * * has vested in the Board of Examiners the power to examine and pass on all claims except those exempted, and the Legislature is without authority to delegate such power to any other board or officer."

The court went on to state:

"If the view is taken that the Legislature intended to make this claim payable by the auditor without presentation to the board of examiners, then the Legislature attempted to do that which it had no power or authority to effectuate, and on this question the language in the case of State ex rel. Davis v. Edwards is not only appropriate, but decisive."

18. 1931, 77 Utah 455, 297 P. 434, 438.

Another case which Examiners rely upon is the recent one of State Board of Education v. Comm. of Finance[19] in which Finance refused to approve payment of the salary of the Superintendent of Public Instruction. The reasons urged were that the Board of Education was not legally constituted and was without authority to appoint a superintendent and fix his salary. The holding was for Education as to this particular authority, but in passing the court observed:

> "The Board of Examiners * * * which must approve all salary claims against the State, except those fixed by law, approved by a vote of two to one the request of the Board of Education to pay Dr. Bateman a salary of $10,000 per annum."

again indicating the court's understanding of the law as it has developed in our state under the decisions hereinabove discussed.

This interpretation of the law is also consonant with the legislative conception of the powers of Examiners as manifest in the various statutes implementing the powers of that board. They provide for the presentation of all claims against the state to the Board of Examiners to be passed upon;[20] that it has certain supervisory powers over the Auditor;[21] and the unanimous consent of its members is required before officers of the state may make deficit expenditures.[22] It is expressly provided that the Department of Finance, the legislatively created administrative arm of the Board of Examiners, is endowed with authority to approve or disapprove of the hiring of all personnel;[23] and is also charged in broad language with the responsibility of investigating the need for existing positions in all departments of state government, "* * * with a view to eliminating any unnecessary ones, * * *" and "* * * no vacancy shall be filled until the commission [finance] has certified to the department requesting the creation of a new position or the filling of the vacancy that the position is necessary to carry on the work."[24]

Finance is also endowed with a general grant of power as to all departments of state government, to establish salary schedules:

> "* * * for the officers, clerks, stenographers and employees of state offices, departments, boards and commissions, except where such salaries are fixed by statute or by appropriation; and such schedule of salaries shall have the force of law in all state offices, departments, boards and commissions, * * *"[25]

19. 1952, 122 Utah 164, 247 P.2d 435, 439.
20. 63-6-11, U.C.A.1953.
21. 63-6-8, U.C.A.1953.
22. 63-6-19, U.C.A.1953.
23. 63-2-14, U.C.A.1953.
24. Ibid.
25. 63-2-13, U.C.A.1953.

The comprehensive nature of the authority granted Finance is further demonstrated by the provision for the appointment of a budget officer with certain supervisory duties with respect to the use of funds in the various departments.[26]

Further of significance is the statutory interdiction directed to the Board of Education:

> "At the end of each month *the state superintendent shall file with the state board of examiners an itemized account of his expenses, including those of the state board of education,* verified by his oath. The said board shall examine the same, and *if the account is found to be correct and the expenditures necessary,* shall certify the same to the state auditor. The state auditor shall issue a warrant on the state treasurer for the amount due on such account, and at the end of each month he shall issue his warrant for one-twelfth of the superintendent's annual salary."[27] (Emphasis added.)

The argument of Education, not entirely implausible, is that if this section is construed with the other statutes relating to its powers and duties, the reasonable construction is that the account required to be filed with and approved by Examiners relates only to the personal expenses of himself and the Board, and not to the general costs of operation of the department. The statute admittedly could have been plainer in meaning had the minds of its framers adverted to the possibility of the difficulties here encountered. It is our view that if that section is considered against the background of the law as discussed in this opinion, and particular note is made of the fact that the final clause singles out for mandatory payment the superintendent's salary, (which is actually fixed by statute and thus under the exception from Examiners' authority of "salaries fixed by law,") a rather strong implication arises that all of the other expenses and expenditures of the department are left within the emphasized portion of the statute just quoted and under the discretionary power of Examiners. In fact it seems difficult to reconcile the language, "if the account is found to be correct and the expenditures necessary" in any other way.

█ Education advances another argument that under the rule giving preference to later statutes over prior ones where there is conflict,[28] it is entitled to prevail in this controversy because Section 53-2-8, U.C.A. 1953, quoted in the forepart of this opinion, authorizing the Board of Education to ap-

26. 63-2-20, U.C.A. 1953.
27. 53-3-9, U.C.A. 1953.

28. Nelden v. Clark, 20 Utah 382, 59 P. 524, 526; Pacific Intermountain Express Co. v. State Tax Comm., 7 Utah 2d 15, 316 P.2d 549.

point and fix the salaries of the various offi-cers and employees of the department which was re-enacted in 1953 constitutes the most recent pronouncement of the legislature and is thus controlling. Generally speaking we do not disagree with this rule, nor with the reasoning upon which it is based. But like all general rules it must be applied with discernment as to whether it fits the fact situation at hand and no rule should be given force in application where the facts plainly negative any such intent. The purpose of the re-enactment of the statute just referred to was solely to amend the provision relating to the Superintendent's salary. No change was made in the other portions of the act and it is obvious that the legislature did not intend any significance to the re-enactment in nullifying other existing statutes of the state because it was later in time.

On the point of statutes taking priority because of subsequent enactment, the fact is that the sections hereinabove discussed conferring supervisory powers upon Finance were all enacted in connection with the reorganization of state government in 1941, (and some subsequent amendments thereto,) and thus, as expressions of legislative will as to governmental policy, were later indications thereof than the statutes relied upon by Education. Corollary to this and entirely consistent with the idea that Examiners has rather broad powers in respect to all of the departments of government, including Education, is the further clearly expressed intent in that regard is shown in Sec. 12 of each general appropriation act since the 1949 Session of the Legislature:

"The board of examiners shall promulgate and publish rules and regulations regarding the conduct and employment of state officers and employees covering working hours, overtime, sick leave, vacations and other matters of personnel policy and enforce such rules and regulations uniformly in all state departments * * * shall adopt rules and regulations * * *, with regard to the establishment of salary schedules for all state departments and institutions * * *. No such salary schedule shall be put into effect until approved by the board of examiners." [29]

Nor do we see anything persuasive in the rule of statutory construction that as to conflicting statutes, the more specific takes precedence over the general,[30] which strangely enough, each party here contends

29. Quoted in Sec. 12, Ch. 164, S.L.U.1955; similar Secs. 12 of Ch. 136, S.L.U.1953; Ch. 123, S.L.U.1951; Ch. 98, S.L.U.1949; same duties upon personnel officer Sec. 12, Ch. 177, S.L.U.1957.

30. Nelden v. Clark, f. note 28 supra; University of Utah v. Richards, 20 Utah 457, 59 P. 96, 98.

favors its position. While it is true that the statutes purport to give Education specific powers within its own department, other statutes cited above give Examiners and Finance specific authority within the particular area relating to personnel, salaries and expenditures.

◼ Usually we are not concerned with questions of policy, nor with the wisdom of legislation. Yet where there is confusion because of conflict between statutes, it is permissible to look to general governmental policies and purpose to interpret the legislative intent. In that vein there are some considerations which provide a reasonable basis for concluding that the legislature regarded it as desirable and therefore intended that Education should be subject to the same regulations as other departments of state government: It is in keeping with the fundamental policy of checks and balances which characterizes our entire system of government. It also tends to keep control close to the people, which is a touchstone of democracy. Examiners is made up of the three top executive officers of the state, who are directly elected by and responsible to the people. This is contrasted to the superintendent who is now appointed by the members of the Board of Education, whose members are elected from the various districts of the state, and whose terms are staggered so that in practical operation the superintendent could exercise a relatively high degree of control over them and himself be comparatively impervious to responsibility to the public. There are also advantages in having some common standards in regard to departmental budgets, personnel requirements, salary schedules, vacations, sick leave and other such matters in order to minimize difficulties which may arise because of lack of uniformity, or even competition in the various state departments.[31]

Were we interpreting the statutes and constitutional provisions relating to the Board of Examiners for the first time we might be more impressed by arguments proposed by Education. However, history and experience have always been the very bone and sinew of the law. As stated by the great Justice Holmes: "The life of the law has not been logic; it has been experience." [32]

Looking at the problems here presented in broad perspective it is important to realize that our legislature has met biennially and in special sessions for many years with both the statutory and decisional law of this state being so understood and applied that in practical operation the Examiners and Finance have exercised general supervisory powers over the fiscal and budgetary

31. See report on State Government to Tax Study Committee by G. Homer Durham, p. 23.

32. Holmes, The Common Law, (38th Ed.) p. 1.

affairs of other departments of state government and no substantial changes have been made in the law in reference thereto.

On the basis of the constitutional provisions, legislative enactments and decisional law of our state as it has developed, we are constrained to reject the contention of Education that it is entirely free from control of or responsibility to Examiners. We do not desire to be understood as saying that Examiners can go so far as to in effect exercise a veto power over legislation by arbitrarily refusing to make funds available which have been appropriated to Education for either general or specific purposes. Insofar as this has been done in certain instances which had considerable bearing upon precipitating this litigation, such actions were wrong. But inasmuch as the funds in question have reverted to the general fund, and the problems are now moot, there is no point in particularizing them.

Notwithstanding the powers conferred upon Examiners by the statutes hereinabove discussed, which must be recognized, that does not mean that it can by arbitrary actions in budgetary matters intrude into the internal affairs of management or control of the functions of Education within the purview of its purpose as provided by law. The latter alone is given the authority and charged with the duty of the "administration of the system of public instruction" in the schools of the state. In order to discharge that responsibility it is essential, and the law contemplates, that it have full control of the framing of policy and other aspects of the internal management of that department in accordance with such purpose.

It is our conclusion that, short of any such capricious or arbitrary actions, the Board of Examiners and its administrative arm, the Commission of Finance, have the authority to examine into and approve or disapprove of proposed expenditures, to adopt regulations pertaining generally to salary schedules and personnel in accordance with the statutes conferring such powers upon them, and that the Superintendent of Public Instruction and the Board of Education are subject thereto in a similar manner to other departments of state government.

Respective counsel are commended for their able and thorough presentations of the issues involved in this case.

No costs awarded.

McDONOUGH, C. J., and WORTHEN, J., concur.

WADE, Justice (concurring).

I concur with the main opinion, but think it desirable to point out that in certain instances in the past Examiners, Finance and/or the Governor have, by arbitrary

actions, and contrary to the law as set forth in the opinion, infringed upon the prerogatives of the Superintendent of Public Instruction and the Board of Education by unjustifiably interfering in their functions. A long list of such grievances are complained of. I set out but a few by way of example:

(a) Arbitrarily reduced the moneys appropriated to ·Weber College for fiscal 1953–54 by $79,027.91.

(b) Refused to make available to U.S. A.C. (now U.S.U.) $20,000.00 which had been appropriated and designated as a research fund.

(c) In April, 1953, reduced the appropriation to Weber College by $5,000.00 on the day the fund was expendable.

(d) Arbitrarily refused to approve numerous salary changes proposed by Education for administrative and supervisory personnel.

HENRIOD, Justice.

I concur. However I cannot subscribe to the concurring opinion of Mr. Justice WADE where he says "in certain instances in the past, Examiners, Finance and/or Governor have, by arbitrary actions, *and contrary to the law* as set forth in the opinion, infringed upon the ·prerogatives of the Superintendent of Public Instruction and the Board of Education by unjustifiably interfering in their functions. A long list of *such* grievances are complained of. I set out but a few by way of example."

Such language assumes that each and every one of the grievances complained of by respondent was an unlawful usurpation of power, including the four instances pointed out by Mr. Justice WADE. Such assumption cannot be indulged, since *most* of the fifteen grievances which were claimed by respondent to have been unlawful usurpations of power represent factual situations giving rise to highly debatable legal questions, and most of which, in similar situations, have been held by this Court *not* to have been any usurpation of power at all, but a proper exercise thereof.

The sweeping statement of Mr. Justice WADE, if taken literally, would dispossess the Board of Examiners and Finance Commission of any control whatsoever as to any and all existing or proposed salaries or personnel irrespective of budgetary control, statutory restriction, necessity, amount of compensation or number of personnel, since most of such grievances had to do with salaries and personnel.