ALLEN v. BOARD OF EDUCATION OF WEBER
COUNTY SCHOOL DIST.

No. 7608.   Decided October 26, 1951.   (236 P. 2d 756.)

Judgment reversed and restraining order set aside.

See 56 C. J., Schools and School Districts, sec. 29. Stare decisis, departing from previous decision presently considered unsound as affected by rule of. 14 Am. Jur., Courts, sec. 78.

*Howell, Stine & Olmstead, S. C. Powell,* Ogden, for appellant.

*Glen E. Fuller,* Salt Lake City, *Wilson & Wilson,* Ogden, for respondent.

McDONOUGH, Justice.

Appeal from a judgment of the District Court of Weber County, Utah, whereby the defendant School Board was restrained from closing the Huntsville School for the attendance and instruction of all students of the junior high school grade residing in Ogden Valley during the year 1950-51.

Two questions are here presented: First, does a board of education of a county school district have the power to discontinue the instruction of students of particular grades in an established school in a community upon its providing reasonably adequate transportation of and instruction for such students in another school in the district? Second, if it has such power, did the defendant School Board abuse its discretion and act arbitrarily in exercising such power under the facts of this case? The trial court answered the first question in the affirmative and based its restraining order upon a finding that the defendant School Board acted arbitrarily in ordering the discontinuance of junior high

school instruction in the Huntsville School and in requiring junior high school students of Ogden Valley to attend the Wahlquist Junior High School during the school year 1950-1951.

The appellant Board of Education, the defendant below, appeals from the judgment; the respondent, the plaintiff below, attacks the conclusion of the court to the effect that the Board of Education possesses the power to order the discontinuance of junior high school work at the Huntsville School. Hereinafter, the parties will be referred to as they appeared below.

Obviously, should this court overrule the trial judge as to his holding that the defendant Board of Education does have the power under the laws of this state to discontinue junior high school instruction in the Huntsville school, we do not confront the question relative to the Board acting arbitrarily in so doing. Since we conclude, for reasons hereinafter given, that the trial court correctly ruled that the defendant School Board possessed the asserted power, we shall first confront the second question stated above and to that end will briefly set out the factual background of defendant Board's action as gleaned from the findings of the trial court.

The defendant Board of Education exists under the laws of the State of Utah for the purpose of maintaining and operating a public school system within Weber County, Utah. It maintains and operates elementary schools and junior and senior high schools within the district, which district has a school population of approximately 6,400 children, 1,463 of whom are in the junior high school grades. The area known as Ogden Valley, which is within Weber County School District, consists of three communities known as Liberty, Eden and Huntsville. The area is surrounded by mountains with one passable year-round roadway leading to other sections of the county. It contains approximately 1,600 inhabitants, including 254 students, of whom on

the last day of the 1949-50 school year 85 were in the grades here involved.

Covering a period of several years prior to August 1, 1950, the defendant Board of Education had made surveys of the Weber County District, for the purpose of determining the weaknesses, if any, of the educational system in that district, and the development of a program to better such system. Prior to the school year 1950-1951, the defendant maintained and operated 10 small junior high schools within the district. As a consequence of the aforementioned survey and the recommendations resulting therefrom, it was determined by the defendant that the operation of such small junior high schools was undesirable from an educational standpoint, and that the ten small junior high school should be consolidated into two junior high schools within the district, thereby giving all of the children of such junior high schools proper and equal educational opportunities. As the result of such survey, the defendant commenced and proceeded with the consolidation of the junior high school students within the district, and with the consolidation made effective with the school year 1950-1951, consummated such program. To carry said plan of consolidation to completion, defendant caused a new school to be erected in the southern portion of the district at a cost of approximately $800,000 known as the "New Junior High School," and expended upon the Wahlquist School about $200,000 for the purpose of remodeling such school and making an addition thereto. Under the program of consolidation, all of the junior high school students of the district were to attend and receive their education at one or the other of these two schools. Defendant's School Board duly passed a resolution to this effect.

Since the year 1926, high school students within the school district, including those of Ogden Valley, have been required to attend and have been transported from their homes to the senior high schools located at Ogden City, transportation of such high school students being in busses

similar to those proposed to be used to transport junior high school students. For some years past, junior high school students residing in Ogden Valley and Ogden Canyon have been transported by busses from their homes to the junior high school operated at Huntsville. The buildings of the Huntsville school provide class room facilities and space, a workshop, a gymnasium, and other requisite miscellaneous equipment and facilities.

The canyon road over which the Valley students would be transported to the Wahlquist School borders Pine View Reservoir for a distance of about four miles and proceeds through Ogden Canyon for a distance of about five additional miles with hazards which the court found are inherent in canyon roads which border on streams. The Wahlquist School is approximately 17 miles from the Valley School at Hunstville. To reach the Wahlquist School, the pupils will be transported over the canyon roads, which are two-lane hard-surfaced highways, by bus. Such students range in age from 12 to 16 years. The road over which the students would be transported has for the past 20 years been one of the safest roads in the county. The lower court found that the elimination of the grades here involved from the Valley School, and the instruction of such students in the Wahlquist School, would have no material effect upon the school as being a community center. The round trip for transportation of students from Ogden Valley to Wahlquist school would consume about an hour and one-half.

The additional findings, being those upon which the lower court based its judgment granting the restraining order, are as follows: (1) That at the time the defendant Board took the action providing for the transportation of the Valley Junior High School students to the Wahlquist School, it was speculative as to whether any advantage would result therefrom to the students of Ogden Valley of junior high school grades or to the students of the first six grades who would continue to attend the Valley school. (2) That it is speculative as to whether the highway through Ogden

Canyon will be maintained in the future as it has been in the past. (3) That on the 5th day of September, 1950, the opening date of school for the 1950-1951 school year, the defendant was unable to provide busses for their transportation which could be properly heated so as to safeguard the health of the students. (4) That the defendant Board prior to the opening day of the school year 1950-1951 failed in its duty to properly instruct the parents of the school children of the junior high school grades of the desirability and advantage to such students of attending said Wahlquist High School rather than the Ogden Valley School at Huntsville.

As to finding numbered (1) hereinabove, suffice it to say that it is immaterial that the evidence before the trial court as to the advantage to be gained by the action of the Board relative to the junior high school students of Ogden Valley left the trier of the fact with a doubt as to its advisability. This for the reason that the decision as to what is best for the school children of the district is left to the decision of the Board of Education by the Legislature of the State of Utah, the body which created it, and it is not incumbent upon that board to convince the court as to the wisdom, expediency or the advantage to be gained by such decision. Furthermore, the record discloses, and the trial court found, that the action of the Board was taken only after a careful survey of the educational needs of the district conducted by experts in the field of education. Also, there is abundant evidence in the record adduced through trained school men relative to the advantage to be gained by the consummation of the plan formulated after such survey. The record leaves no shadow of doubt that the questioned action of the Board was dictated by a desire to improve and advance education in the district of which they are the governing body. Such decision was based not on speculation but upon the dictates of abundant experience. As to finding No. 2 above, it need merely be said that there is no evidence in the record to

incite the speculation indulged. The finding to the effect that upon the opening day of school the defendant was unable to provide properly heated busses for the transportation of students is perhaps correct insofar as it goes. However, there is no evidence in the record, and the implications thereof are to the contrary, that heated busses would be required on the opening day of school. Indeed, the court might well have taken judicial notice of the fact that the contrary is true. Furthermore, the defendant offered testimony through its supervisor of busses that it was the intention of the Board to provide new, adequately-heated busses during the cold weather. Finding No. 4, if it be regarded as a piece of sound advice, might well meet with our approval. We are confident that had the School Board properly brought home to the parents of the children here involved, the advantage to be gained by the anticipated change, they might well be converted to the viewpoint of the Board. However, this is far short of saying that the courts have the power to direct or control the public relations of a board of education by the use of the extraordinary writs of injunction and mandamus. The statement of this court in *Beard* v. *Board of Education of North Summit School District*, 81 Utah 51, 83, 16 P. 2d 900, 912, is here applicable. In speaking of the discretion of the school board in the use of school buildings, this court, speaking through Mr. Justice Folland, stated:

"* * * Discretion, however, to determine whether or not a school building will be used for such purpose is vested in the board of education and not in the courts. There are remedies available to any citizens of a district who believe the board of education has acted unwisely or will so act in the future. One is by petition to the board, and the other is by election of new members. The exercise of discretion within legal limits will not be interfered with by the courts except for compelling legal or equitable reasons where the board has clearly abused the discretion vested in it."

From what has been said, it follows that the trial court erred in holding that the defendant board abused its discretion and acted arbitrarily in the premises.

However, plaintiff by his cross appeal, as noted herein-above, attacks the holding of the court below to the effect that the defendant school board possesses the authority to discontinue the junior high school at Huntsville and require the students thereof to attend the Wahlquist Junior High School. He contends that under the case of *Hansen et al.* v. *Board of Education of Emery County School District,* 101 Utah 15, 116 P. 2d 936, a county school board of education lacks the power to discontinue a school in a community. He further argues that to so hold and yet sanction the discontinuance of the junior high school at Huntsville, is to permit the school board to do that piece-meal which it has no authority to do if done by the process of outright abandonment or discontinuance. He further contends that under the *Hansen* decision, supra, the School Board lacks authority not merely to discontinue but to change a school. We are not persuaded that were we to here reaffirm our decisions in the *Hansen* case it would necessarily follow that the questioned action of the defendant board would be governed by that decision. We, however, shall not stop to examine that question since the court is of the opinion that the reasoning in the *Hansen* case should be re-examined. In that case, the Board of Education of the Emery County School District sought by appropriate action to discontinue the school at Elmo, a town in Emery County. The school at Elmo was a four-room brick school building with the equipment and furniture adequate for the teaching of children in the primary and grammar school grades. By the action of the Board, it was decreed that such school be closed and that the children who theretofore attended the Elmo School be required to attend a school in the town of Cleveland which was located within the school district some 4.1 miles distant from Elmo. In an action commenced in the district court, the School Board was restrained from closing the school at Elmo and was required to provide for the continuation and maintenance of the school for the children and inhabitants residing in and about the town of Elmo. Upon appeal, this court affirmed the trial court, basing its de-

cision upon the ground that the board of education of a county school district, lacks the authority to discontinue or abandon any established school within the district. In reaching that conclusion, the majority court reasoned as follows: The Legislature of 1896, the first Legislature which convened after the adoption of the Constitution of the State of Utah, provided for the establishment of school districts throughout the state where not theretofore established, and provided for the election of school boards to administer or govern them. Among the duties enjoined and the powers conferred on such board, it is pointed out, was the following:

"It [district school board] shall organize, maintain and conveniently locate schools for the education of the children of school age within the district, or change or discontinue any of them according to law". Laws of Utah, 1896, chap. 130, sec. 51, p. 481.

In the same enactment, the manner in which these powers were to be exercised was detailed.

Laws of Utah, 1896, Chap. 130, Article VI, sec. 58, p. 482, provided as follows:

"When necessary for the welfare of the schools of the district, or to provide for the children therein proper school privileges, or whenever petitioned to do so by one-fourth of the resident taxpayers of the district, the board shall call a meeting of the qualified voters, as defined in Section 49, at some convenient time and place fixed by the board, to vote upon the question of the selection, purchase, exchange, or sale of a schoolhouse site, or the erection, removal, purchase, exchange or sale of a schoolhouse. * * * If a majority of such voters present at such meeting shall by vote select the schoolhouse site or shall be in favor of the purchase, exchange or sale of a designated schoolhouse site, or of the erection, removal or sale of a schoolhouse, as the case may be, the Board shall locate, purchase, exchange or sell such site, or erect, remove or sell such schoolhouse, as the case may be, in accordance with such vote of such majority; provided, that it shall require a two-thirds vote to order the removal of a schoolhouse."

This section was carried in the statutes of the State until repealed by Chapter 78, Laws of Utah 1915. Parenthetical-

ly, it may be observed that the section was copied by the compilers into the Compiled Laws of Utah 1917, and was purportedly repealed by Chap. 94, Laws of Utah 1921.

In 1905, the Legislature passed an act providing for county school districts of the first class. Such school districts were placed on the same basis of administration as school districts in cities of the second class. This act, which repealed all acts and parts of acts in conflict with its provisions, is chapter 107, Laws of Utah 1905. Sec. 21 thereof provided:

"The Board of Education shall have the power and authority to purchase and sell schoolhouse sites and improvements thereon; to construct and erect school buildings and to furnish the same; to establish, locate, and maintain kindergarten schools, common schools, consisting of primary and grammar grades, high schools, and industrial or manual training schools; * * * to do all things needful for the maintenance, prosperity and success of the schools, and the promotion of education; to adopt by-laws and rules for the procedure of the Board of Education, and make and enforce all needful rules and regulations for the control and management of the public schools of the district."

Ten years later, the Legislature of 1915 by Chapter 78, Laws of Utah 1915, provided that:

"Each county within the State shall constitute a county school district of the first class; provided, that existing county school districts of the first class shall continue as such county school districts of the first class, and provided, that if in any county there be a school population of 5,000 or more and said county is already divided into two or more high school districts, then each of said high school districts shall constitute and is hereby created a county school district of the first class."

By this enactment, the Legislature extended to all the schools of the State the organization and government which had in 1905 been provided for county school districts of the first class as therein defined. By the same 1915 enactment, the Legislature specifically repealed all the provisions of the statutes theretofore applicable to school dis-

tricts as they existed prior to the creation of county school districts of the first class. Among the sections thereby repealed was Section 51, Article 6, Chapter 130, Laws of Utah 1896, hereinabove quoted and carried into the Compiled Laws of Utah, 1907, as section 1816, chapter 6, title 66. The provision thus repealed was the one which provided that the formerly constituted school board might change or discontinue any school in accordance with the provisions of law as hereinabove set out.

It was reasoned in the *Hansen* case, supra [101 Utah 15, 116 P. 2d 939], that since the school board, or board of trustees, of the originally created school districts was given the specific power to "change or discontinue [schools] according to law," and that such specific authority was not given to the Board of Education of County School Districts of the first class, now called County School Districts, Sec. 75-9-1, U. C. A. 1943, that it was the intention of the Legislature to withhold from such boards of education the power to discontinue or change any school. In this, we think the court erred, and for the reason hereinafter stated we are of the opinion that the doctrine of stare decissis should not interpose to preclude correction.

The opinion stated ■

"We find nothing in the statutes showing the legislature had the intention to vest in the boards of education or the successors of the boards of trustees the power vested in the old boards of trustees, i. e., to change or discontinue schools in county school districts".

Contrary to the conclusion thus stated, and aside from the broad grant of power given to county boards of education and the evident reason for conferring that power presently to be adverted to, we believe that the specific power is by necessary implication contained in the first grant mentioned in Sec. 75-9-1, U. C. A. 1943. The power referred to is that which authorizes every board of education to purchase and sell school house sites and the improvements thereon. Patently, one, if not the only, improvement which

would be found on a schoolhouse site would be a school building. Clearly, if the school board has authority to sell a schoolhouse, and the real property upon which it is erected, this necessarily contemplates the discontinuance of the functions of a school therein by the board which exercises that power. This grant alone would be sufficient authority for a school board to discontinue a school.

But in addition to the specific grant of power just alluded to, boards of education of county school districts were given authority never conferred upon the old common school board of trustees, namely, the power "to do all things needful for the maintenance, prosperity and success of the schools, and the promotion of education."

The reason for granting this broader power and wider discretion to the boards of education provided for in the enactments of 1905 and 1915, and the object to be attained thereby, are clearly revealed in the history of education in this state and particularly in the history of the movement for school consolidation in the counties of the state and of the consummation of that objective. The early schools of this state were necessarily established in villages, towns and hamlets scattered throughout the wide area of the state. These schools in most instances were small, one to four room schools which served only the immediate community. The laws enacted for the organization of these small school districts and for the government thereof were enacted with those facts in mind. Consequently, limited specific powers were conferred upon the trustees of such common school districts and these power were in important respects hedged with conditions. As noted hereinabove, in order for such board to erect or remove, purchase, exchange, or sell a schoolhouse, it was necessary to secure an affirmative vote of the qualified electors in the local school district before such could be done, and in order to remove a schoolhouse a two-thirds vote was required. This was an altogether reasonable provision in view of the fact that the rural schoolhouse was very often a center of community

life. Its location and its removal were matters of much concern to the people residing in such communities. It was perhaps thought not advisable to leave in the hands of three trustees of the district such matters since preference might be given to one group in the community over another. The decision being left to the electors of the local school district, it was perhaps thought that the interests of all would thereby be better protected. But contemporaneously with the increase in population throughout the state and notably in urban communities forward-looking educators saw the need for a different type school organization and school government.[3] Recognition of this fact found expression at the time of the adoption of the Constitution of the State of Utah. Article 10, Section 6, thereof, provides,

"In cities of the first and second class the public school system shall be controlled by the Board of Education of such cities, separate and apart from the counties in which said cities are located."

In accordance with this constitutional provision, the Legislatures of 1896 and 1897 provided for boards of education of cities of the first and second class separate and apart from the boards which governed the local school districts in the counties. See Laws of Utah 1896, commencing at p. 497; Laws of Utah 1897, commencing at p. 142. The powers conferred on the city school boards were precisely those which present laws confers upon county school districts.

After the adoption of the Constitution, prominent educators began preaching the advantages of the rural consolidation.[4] This movement met with such approval that by 1905 the legislators were convinced of its wisdom and provided for county school districts of the first class in 1905. Prior to the enactment of this legislation, there were 36 school districts in Salt Lake County outside of Salt Lake

---

[3]See Bateman, Development of the County-Unit School District in Utah-Bureau of Publications, Teachers College, Columbia University.
[4]Ibid, p. 18 et seq.

City and in 1900 there were 380 school districts in the State of Utah.[5] Illustrative of the effect of the 1905 legislation and of the contemporary construction thereof is the action taken in Salt Lake County under the provisions of the 1905 law. Salt Lake County, outside of Salt Lake City, was divided into two county school districts of the first class. Between January 1, 1905, and July 1, 1907, 17 small school buildings containing 37 rooms were abandoned and sold, or torn down to make place for modern structures.[6] Thus, immediately upon the adoption of the act, these school boards construed it as permitting the abandonment or discontinuance of schools. This construction continued throughout that portion of the state which qualified as county school districts of the first class and, after the state as a whole was divided into county school districts by the legislation of 1915, that construction was adopted and put into effect throughout the state. This, obviously, was necessarily so, since the very reason for consolidation of school districts was to provide larger, more modern, better-equipped schools for the children of the state, and to provide for their graduation in classes where better instruction by more competent teachers could be provided. This program necessitated the abandonment of numerous small inadequately equipped, poorly ventilated, sometimes dangerously heated, schools in rural areas. Were this not so, consolidation would have neither purpose nor meaning.

In the light of what thus appears to be the obvious meaning of the section of the statute here under scrutiny, in light of the evident purpose motivating its enactment, and in light of the contemporary and continued construction placed thereon by the governing bodies charged with administering such law, we are impelled to overrule the decision in the *Hansen* case, supra.

In reaching this conclusion, we are not unmindful of the doctrine of stare decisis, hereinabove adverted to, nor of its

[5]Ibid, pp. 15 and 30.
[6]See Cannon, The Story of John W. Smith, Bulletin Publishing Co.

extreme importance in guiding the decision of a court. A proper regard for the prior work of a court and the stability of the law demands deep respect for pre- cedent. Whether, however, a decision should be ad- hered to, although later thought to be erroneous, depends primarily upon the nature of the question decided. Of course, where the earlier opinion announced and applied a rule fixing the status of property or affecting title there- to, or where the law laid down in such decisions has ap- parently entered into the general life of the people and it is fair to assume that contracts and other relationships have been entered into on the faith of the announced rule, the doctrine should apply in all its vigour and it should be left to the Legislature to correct whatever future ill might be thought the result of the announced rule. Since we are here dealing with the construction of a legislative enactment, we might perhaps be content to await the action of the Legis- lature to grant power which it appears to us was conferred more than a third of a century ago. However, two factors impel us to do otherwise. In the first place, if the Legisla- ture were merely to amend the present law specifically authorizing school boards to discontinue a school, that limited grant might, in light of the previous decision of this court, be construed so as to give no meaning whatever to the broad power conferred upon the board of education, "to do all things needful for the maintenance, prosperity and success of the schools, and the promotion of educ- ation." This might be true even though the doctrine of "ejusdem generis" were invoked to limit the meaning of the quoted grant. In the second place, we believe there is im- plicit in the former opinion of the court the application of a rule of construction which should not be left undisturbed as a precedent.

True, as pointed out in our prior decision, the Board of Education, being a creation of the Legislature, has only such powers as are expressly conferred upon it and such

implied powers as are necessary to execute and carry into effect its express powers. Furthermore, it is clear that when express powers are conferred upon such a governing body and by subsequent amendment a section of the enactment which conferred a specific power is repealed, there is manifest a legislative intent to withdraw the specific power. It must be remembered, however, that the primary rule of construction of a statute is to ascertain and declare the intention of the Legislature and to carry such intention into effect. This latter being true, it seems manifest that an error of approach was committed in the prior decision. Assuming that it is not clear that the questioned power is necessarily implied in a specific grant to the board, and assuming that extrinsic aids to construction must be invoked to determine the reach of the broad grant of power discussed hereinabove, nevertheless, it was error to simply compare the specific powers granted county boards of education to those conferred on the abolished local school boards.

In the 1905 act creating county school districts of the first class, the Legislature declared its intention to place such districts on the same basis of administration as school districts of cities, and thereupon, in order to carry out such intention, conferred upon boards of education of the county school districts thereby created, the precise powers theretofore granted city boards of education. This being so, the Court should have looked to the conditions and circumstances which motivated the framers of the Constitution and subsequent Legislatures in placing boards of education in cities in a separate administrative category from school districts in counties outside of cities, and, if ascertainable, to divine the objectives to be attained thereby. These factors having been ascertained, the question of whether the challenged power is lodged in city boards of education should have been resolved in light of such factors, rather than to inquire whether a specific power granted to the

circumscribed local board, was expressly conferred on city boards of education.

For the reasons stated, the case of *Hansen* v. *Board of Education,* supra, is overruled. The judgment below is reversed and the restraining order is set aside. No costs are awarded.

WOLFE, C. J., and WADE and CROCKETT, JJ., concur.

HENRIOD, J., not participating.