326 P.2d 400

In the Matter of the ESTATE OF Alice Greenwood SMITH, Deceased.

Juanita C. Smith, Guardian of the Estate and Person of Dennis G. Smith, a minor, Appellant.

No. 8688.

Supreme Court of Utah.

June 4, 1958.

Draper, Sandack & Draper, Salt Lake City, for appellant.

Clyde & Mecham, Elliott Lee Pratt, Salt Lake City, for respondent.

JONES, District Judge.

Should adopted children inherit from their adoptive parents' relatives: This is the sole question presented by this appeal. Appellant, as guardian of the estate of an adopted child, asserts that the probate court erred in declining to include said minor as an heir to the adoptive father's mother's estate. Respondent relies on the decision of this court in Re Harrington's Estate, 96 Utah 252, 85 P.2d 630, 120 A.L.R. 830. It was there determined that an adopted child was not "issue" of the adopting father's parent.[1]

Appellant contends that Harrington should now be overruled for two reasons: (1) this Court failed to fully consider the legislative history of our adoption statute (now 78–30–10, U.C.A.1953, and see 74–4–5, U.C.A.1953); and (2) the great increase in the number of adoptions in this jurisdiction in recent years requires that this entire question of the relationship of an adopted child to the adopting parents' family be now re-examined in the light of "modern thinking." We have examined the citations and references contained in the briefs and are not persuaded that we should now overrule our prior decision, and thereby create uncertainty as to an important rule of property which is firmly established in this jurisdiction.[2]

In making this disposition of this case we are not unmindful of the complex social problems arising from the large number of broken homes which have plagued society in recent years with the consequent problem of how to best place children in new families.[3]

But, notwithstanding the pressing social problems, we are not constrained to overrule our former decision. If it is desirable that our statute law, as construed by this court nineteen years ago, be amended, the Legislature and not the courts is the proper forum to consider and act on this proposal.

Affirmed.

McDONOUGH, C. J., and WADE and WORTHEN, JJ., concur.

CROCKETT, Justice (dissenting).

Before addressing the question: does the language of Section 74–4–5(2), U.C.A.1953, providing for the descent of estate to children or, if dead to "the issue of the deceased child[ren] * * *" include a child adopted by a deceased child, that is, an adoptive grandchild of the decedent, I digress to concede the adverse Harrington case, and to acknowledge some deference to the rule of stare decisis. The importance

---

1. For a discussion of the meaning of the words "child" and "issue," see Vol. 43 Mich.Law Rev. 727.

2. Most of the cases relied on by appellant are reviewed in Re Stanford's Estate, Cal., 315 P.2d 681. It was there held that an adult and her two children adopted after the death of the testatrix are to be included as remaindermen.

3. See Brooks & Brooks, "Adventuring in Adoption"; and Bureau Publications 148 and 216, U. S. Department of Labor.

to be placed upon that rule depends upon the extent to which property rights may have become fixed in reliance on established law. In view of the solid front of my colleagues to the contrary in this case, it does not matter whether I would repose sufficient importance therein to leave the Harrington decision undisturbed. Nevertheless I deem it advisable to set forth my views.

First I do not think that property rights which may have come into being based upon such prior adjudication would be extensive. And any which have not yet vested would be subject to adjustment. Any disadvantages that may result would be outweighted by the advantages to be gained by announcing the correct rule in accordance with the fundamental purpose and intent of the statute. However desirable solidarity in law may be, it should not be accorded any such sanctity as to require perpetuation of error.[1] Consistency may be a jewel, but perseverance in error would not add to its lustre.

When questions arise as to the interpretation and application of statutes, it is both necessary and desirable, in order to give effect to the legislative intent, to consider the purpose lying behind them. This doctrine of statutory construction is so well established as not to admit of dispute nor require extensive citation of authority. A classic example is the case of Church of the Holy Trinity v. United States,[2] wherein a law designed to prohibit the practice of bringing indentured laborers from Europe was held not to apply to a contract by which the church hired a minister to come here from England. The court, after fully discussing the matter and going back to ancient authorities, said:

> "It is a familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers."

This principle has had full recognition here. In Norville v. State Tax Commission,[3] Justice Wolfe, for the court, quoted with approval the eminent authority, Sutherland, on Statutory Construction:

> "In the exposition of a statute the intention * * * will prevail over the literal sense of the terms; and its reason and intention will prevail over the strict letter."

citing numerous authorities.

The purpose underlying statutes of descent is to establish an orderly way for property to pass by operation of law from members of a family who die to those who

1. Allen v. Board of Education, 120 Utah 556, 236 P.2d 756; Austad v. Austad, 2 Utah 2d 49, 269 P.2d 284, 48 A.L.R. 2d 256.

2. 143 U.S. 457, 12 S.Ct. 511, 512, 36 L.Ed. 226.
3. 98 Utah 170, 97 P.2d 937, 939, 126 A.L.R. 1318.

survive. How this should be accomplished involves consideration of what would most likely accord with the desires of the deceased toward his family, who are the natural objects of his bounty; the degree of relationship; his actual and potential obligations to them as dependents; and what the survivors might reasonably expect due to such considerations. Fashioned upon these foundations, our statutes of descent correlate to what experience teaches is reasonably to be expected in passing on property within families. This being so, they find willing acceptance as the proper and just method for distribution of estates, and meet the needs of society by tending to promote harmony and good will among surviving family members.

If the foregoing is the purpose of the statute in question, and I can conceive of none other, then it seems to me that the reasons why an adopted child should be included in inheritance in the entire adoptive family greatly preponderate over any of the so-called "reasons" to the contrary, which I submit upon analysis will prove to be specious and without merit.

The ground most frequently advanced as to why an adopted child should inherit only from his adoptive parents and not through them to other adoptive relatives is that the adoption proceeding is one of contract with the adopting parents and that only they are bound. This appears to me to be a very superficial view of the matter. By way of analogy, the marriage contract is only between the two spouses and in simple terms, yet it creates a comprehensive relationship, not only between the immediate parties, but for everyone else, particularly the members of both families involved, and the family to be. Likewise the adoption contract creates a personal relationship between the immediate parties, that is, the same relationship as the natural relationship of parent and child, and it has its effect upon others.

It is patent that the view that the effect of the adoption proceeding is limited to the parties to the contract is entirely too restricted. If such were the case, an adopted child would not even have any family relationship to brothers and sisters in the family, only one minor facet of such a limitation would be the failure to inherit from each other. A plainly incongruous result and squarely inconsistent with the mandate of the adoption statutes as hereinafter pointed out.

An adjunct of the restricted contract basis for opposing inheritance in the family by the adopted child is that the adoptive parents can agree to take for themselves an heir, but they cannot thus take one for their kindred and "impose" him upon the family.[4]

4. Mott v. National Bank of Commerce, 190 Va. 1006, 59 S.E.2d 97; see also Annotations, 38 A.L.R. 8; 120 A.L.R. 837 and 43 A.L.R.2d 1202.

The supposition that one would adopt a child and take on the serious and onerous responsibilities of parenthood with any such ulterior motive as "imposing an heir" on his own parents or other relatives is so unrealistic as to be ludicrous. There is no more danger of this than that one would go about having natural children for such purpose. The fact that heirs can be, and are, voluntarily brought into being by the biological process has not given rise to any claim it is being done, or overdone, for the sole purpose of imposing heirs on relatives. Yet if statistics are to be credited, families are acquired more readily that way and a good deal more often than by adoption. The manner in which one acquires his family is his business and to be done in the way he best can manage. If for reasons sufficient unto himself, he acquires his child or family by adoption, I submit that there can be found no sound reason in law, morals or logic why he or his children should be discriminated against by being refused full acceptance into the family for all purposes including inheritance.

The further fact is that the relatives are not defenseless against any such "imposition"; but by the easy expedient of making a will can remove any such burden, the same as they can as to other heirs. It is no answer to say that a grandparent who loves and desires his adopted grandchild to inherit can so provide by will. Every aspect of such argument applies with equal force to natural children. Both can be either included or excluded from inheritance by will. But the natural child has the advantage that he inherits unless expressly excluded, whereas the adopted child has no more right than a stranger, because anyone can be included by will. The fact is that for various reasons many people just don't get around to making wills. This results in the exclusion of the adopted child as a member of the family insofar as that particular aspect of family unity is concerned. He is a member of the family, yet he is not, and the realization of this fact by him and other members of the family leaves an area of rejection which is, in many instances, more important psychologically than is concern over material values.

The matter of blood relationship is also given as a "reason" for not allowing the adopted child to inherit. An appraisal of the contention reveals that it is of no such importance as to be controlling. Instances of babies being exchanged at birth a la "Puddinhead Wilson";[5] and babies or children being taken into families where ties of love and affection have grown, attest that the matter of accident of birth becomes completely submerged and is quite unimportant in comparison to the other ties that develop between human beings. They corroborate the thesis of the social scientists that the essence of the family relationship

5. Puddinhead Wilson: a story by Mark Twain.

410

is sociological rather than merely physiological. People who think otherwise are sometimes surprised to realize that the most persuasive proof of such fact exists in every well ordered family, including their own. The husband and wife are not related to each other by blood, as they are to their own brothers and sisters, and other relatives. Yet through their common interests and companionship the bond of love and affection is usually such that few would admit it inferior to that with their "blood" relatives. Most everyone has in his family tree some examples which make this point abundantly clear.

I turn from consideration of the so-called "reasons" to the contrary, to the much more important subject: the affirmative aspect of why the fair, reasonable and proper interpretation of the statute is that the legislative purpose was to provide an orderly method for the descent of property within families without any idea whatsoever of making any distinction on the basis of how the families came into being as such; and that this necessarily presupposes harmonizing with the law of adoptions, the purpose of which is to make the adopted child a member of the family for all intents and purposes, including inheritance within the adoptive family.

Concededly we are usually not concerned with questions of policy in the interpretation of statutes. But where a statute is susceptible to more than one reasonable interpretation, it is permissible to look to the social effects and desirability of the result to appraise what the purpose and intent was.[6] No one suggests any other thought than that adoption is a highly commendable humanitarian practice and that it serves an extremely important social need; nor that it should be the policy of the law to foster and encourage it in every way possible. Likewise, it is not doubted that it is desirable to afford both the adoptive parents and the adopted child the best possible opportunity for the obliteration of any antecedent difficulties that may have existed and to remove all barriers, including psychological ones, to the desired objective: the fullest possible measure of acceptance and love in the adoptive home. It is obvious that this can best be accomplished when there is no area in which the adopted child is excluded or made to feel different from any other child in his relationship to the family. Authorities in the social sciences who by their training and experience are acquainted with this subject uniformly affirm the above point of view. It is so plainly the desideratum that it is hard to conceive of anyone opposing it or desiring to place any obstacle in the path of such purpose

Justice Traynor sets forth an excellent dissertation of this point of view in his dis-

6. See Batemen v. Board of Examiners, 7 Utah 2d 221, 322 P.2d 381.

senting opinion in the case of In re Calhoun's Estate,[7] epitomized by this statement:

"* * * Whatever doubts there may have been with respect to that policy in the past, it is clear today that the objective of adoption is the 'consummation of the closest conceivable counterpart of the relationship of parent and child,' in which the child becomes a member 'to all intents and purposes, of the family of the foster parents.' (Citing cases) Only by treating the adoptive child as a natural child for all purposes of inheritance is that objective obtained."

In Carpenter v. United States,[8] Circuit Judge Goodrich in holding that an adoptive sister is a "sister" under a national service life insurance policy, has similarly expressed the view which, as I see it, comprehends the larger social aspects and implications of the problem and what I therefore choose to call the more enlightened view of the matter.

"These instances of the legislative recognition of the position of the adopted child reflect, we think, the current opinion on the subject by those in the field of family relations who have given the matter the most careful and thoughtful consideration. They include sociologists of note. Even more important in this field, we think, is the opinion of those engaged in the family relations side of social work, whose contact with the problems is a day to day experience. We are convinced that the current of modern thought on the matter is wholly in the direction of placing the adopted child in the family of his adoption as completely as though the relationship from the beginning had been by blood. We give a few instances expressing this point of view in the margin." (Citing authorities.)

If the statute in question is read having in mind the purpose which the legislature was seeking to accomplish, it seems clear that the intent was simply to provide an orderly method for the descent of property within families. There is nothing in the general context or the specific wording of the statute from which any idea can be gleaned that it was either intended or implied that the word "issue" was meant to have any such restricted meaning as "issue of the body." The context indicates plainly that it is using the word "issue" as synonymous to and interchangeably with the word "child," apparently for the purpose of avoiding repetition of the same words. Comparison of the emphasized words renders this point clear:

"If the decedent leaves no surviving husband or wife, but leaves issue, the

7. 44 Cal.2d 378, 282 P.2d 880, at pages 888, 889.

8. 3 Cir., 168 F.2d 369, 372, 3 A.L.R.2d

whole estate goes to such issue, and if *such issue* consists of more than *one child* living, or *one child* living and the *issue* of one or more deceased *children,* then the estate goes in equal shares to the *children* living, or to the children living and the *issue* of the deceased *child or children* by right of representation."

While it seems to me that the above discussion demonstrates that if the statute of descent were applied in accordance with its purpose the appellant should inherit, due consideration of the statutes on adoption show even more persuasively that such is the proper interpretation of our statutory law. They spell out so plainly as not to admit of doubt that the purpose is to establish the family relationship just as with a natural child by birth:

Sec. 78–30–8 relating to the adoption agreement provides that it shall be to the effect that the child shall be, "treated in all respects as [their] own lawful child";

Sec. 78–30–9 provides that after the court has made its determination, "it must make an order declaring *that the child shall thenceforth be regarded and treated in all respects as the child of the person adopting.*";

Sec. 78–30–10 provides that, "after the adoption the two shall sustain the legal relation of parent and child, and

have all the rights and be subject to all the duties of that relation."

Further indication that it is the legislative purpose to make the adoption proceeding equivalent to what has been called "a social type of birth" and confer upon the child the same legal status as a natural born child is found in Sec. 26–15–16 providing for the issuance of a supplementary birth certificate to reflect the status established by the adoption, i. e., the parent-child relationship of the child and the adopting parents; and that thereafter all information disclosed shall be from the supplementary certificate, and providing for sealing and secrecy of the original.

I fail to see how it can reasonably be doubted that it was the legislative intent to confer upon the adopted child all the rights a natural child has with his parents, and within the family, and therefore the rights arising by law therefrom. The only way he can be "treated *in all respects* as the child of the person adopting" is by according him every legal right attendant upon that relationship, and the order of court directed by statute is obviously intended to affect not only the immediate parties but all the world. Any other interpretation is inconsistent with not only the fair import but the literal wording of these statutes. Compliance with them is in no way inconsistent with the intent and purpose of the statute of descent, 74–4–5(2) hereinabove quoted, and is in harmony with the objec-

tive which all enlightened authorities agree to, and no one voices any disagreement with, that is, to have the adopted child become a member of the adopting family for all intents and purposes. This was the salutary and clearly manifest intent of our legislature.

HENRIOD, J., having disqualified himself does not participate herein.