396 P.2d 416

**S. G. RICKER et al., Plaintiffs and Respondents,**

v.

**The BOARD OF EDUCATION OF MILLARD COUNTY SCHOOL DISTRICT, Defendant and Appellant.**

No. 10215.

Supreme Court of Utah.

Nov. 6, 1964.

Thorpe Wadingham, Delta, Marr, Wilkins & Cannon, Salt Lake City, for appellant.

Pugsley, Hayes, Rampton & Watkiss, Salt Lake City, A. Lee Petersen, Fillmore, for respondents.

CROCKETT, Justice:

Plaintiffs as taxpayers sued to prevent the Board of Education of Millard County

School District from going forward with a planned school-building program, particularly from proceeding with a new junior and senior high school at Delta projected to cost about $1,786,000.

Acting pursuant to Section 53–10–7, U.C. A.1953,[1] the defendant Board published in two local newspapers notice of a school bond election and a copy of the official ballot. It also had printed an explanatory brochure concerning the election and its purpose. Copies were distributed to the public and parts of it were published in the newspapers "in conjunction with," but not as a part of, the statutory notice. The explanation included the purpose of the bonding program, the amount of money to be raised and the effect on the tax levy. It indicated generally that the funds would be spent under two main categories: high schools and elementary schools; that the main item in high schools would be a new combined junior and senior high school at Delta at a cost of about $1,250,000; that about $75,000 would be spent in building a new farm shop at the Millard High School at Fillmore; and at the latter school about $80,000 would be spent on a remodeling project. It also mentioned several proposals under consideration for construction and remodeling of grade schools in the district, for which no cost estimates were given.

The bond election carried, and the Board then proceeded to get a definite estimate from an architect as to the cost of the junior-senior high school at Delta. As is not uncommon in regard to building costs, particularly in recent years, it was found that the preliminary estimate of $1,250,000 for that project was too low; that its actual cost would be between $1,645,000 and $1,786,000. This increase is the main cause of the instant difficulty. Based on the 1964 assessed valuation, the maximum amount of bonds that could be issued is $1,935,000. Consequently, if the Board proceeds with its expressed intention to construct the junior-senior high school at Delta and carries out the project of building the farm shop and remodeling program at the Millard High School at Fillmore, only a comparatively small amount of money will be left for elementary school needs mentioned in the brochure.

Plaintiffs contend that the defendant Board should not be allowed to use substantially all of the money for the high-school projects, but should allocate a proper portion to the elementary school needs as was represented in the brochure. They insist that to do otherwise is a violation of the condition upon which the public voted for the bonds and a breach of faith by defendants in the performance of their duties. To support this position and emphasize the im-

1. All references to statutes herein are to U.C.A.1953.

providence of carrying out the school Board's proposal, they point out that the present bond issue will exhaust all sources for extra school funds for about 10 years.

The defendant Board argues that it is bound only by the general commitment to use the funds for school purposes stated in the statutory notice and not by the statements in the explanatory brochure; that in any event, the cost figures mentioned in the latter document were and could only be at that stage tentative estimates; and that in order to properly discharge its duties it is necessary that it have a free hand to spend the funds for the most pressing needs of the district, which it regards as the three high-school projects above referred to.·

·After a trial and consideration of the issues, the district court ruled that the defendant Board should allocate the money raised by the bond issue for the purposes stated in the brochure. It took the estimates given for the three high-school projects, totaling $1,405,000 and added 10 per cent, arriving at the figure of $1,545,500, and set that as the limit to be spent on those projects, leaving the rest to be used for the improvement of other schools in the district.

This appeal involves the propriety of the order just stated and raises the question whether the plaintiffs in this proceeding can compel the defendant Board to use the money raised in the bond election only in the amounts stated and for the purposes specified in the brochure.

■■■ An incidental problem of concern relates to the effect of the publication of the brochure. The usual rule is that it is the notice published pursuant to the statute which binds the Board, and that collateral statements or explanatory materials do not.[2] However, in the instant situation the plaintiffs argue that the explanatory material was published in conjunction with the statutory notice in such a manner that the public would not, and in fairness should not, be required to make any such fine distinction but would reasonably regard them as one and the same. We do not disagree with the idea that public officials should not be allowed to make representations or publish materials deliberately calculated to mislead the voters, and then escape responsibility for their commitments with the excuse that such representations were not part of the official notice.[3] But the trial court did not so regard the situation here and expressly recited in its conclusions that the representations in the brochure were not made with intent to deceive or mislead and that its pub-

2. State ex rel. Utah Savings & Trust Co. v. Salt Lake City, 35 Utah 25, 37–39, 99 P. 255, 259 (1908); see Brinkerhoff v. King, 57 Utah 300, 304–305, 194 P. 659, 661 (1920); Anselmi v. City of Rock Springs, 53 Wyo. 223, 235, 80 P.2d 419, 423, 116 A.L.R. 1250 (1938).

3. See State ex rel. Utah Savings & Trust Co. v. Salt Lake City, 35 Utah at 40, 99 P. at 260 (1908).

lication did not constitute any misrepresentation. Nevertheless, for the purposes of meeting the principal issue in this case forthrightly, we proceed upon the assumption that plaintiffs are correct in asserting that the public reasonably could and did regard the statements as to the various school needs as part of the notice of the election.

It is undoubted that Sections 53–10–9 and 7, relating to the purpose and requiring publication of the notice of the school bond election, are designed to give notice of the essential facts to the public. But it will be noted that the requirement concerning the use of funds refers only to the general purpose.[4] Moreover, these sections are to be read and understood as a part of the entire Title 53. Chapters 10 and 11 grant the board powers and impose duties in regard to finances. They specify standards to be observed in conducting a capital expenditure program for building and maintaining school buildings. Other sections authorize the state board of education to set standards for determining classroom needs, selecting school sites, and maintaining existing buildings. It is apparent from the tenor of the entire act that the legislature intended the district board, in cooperation with the state board of education, to make the decisions concerning buildings. Consequently, it would be quite illogical to suppose that the taxpayers could decide those matters which the legislature has delegated to the discretion of the district and state boards of education.[5]

Consistent with the idea that the board was intended to have plenary powers in administering the affairs of the school district is the further provision in Section 53–6–20 charging it with the duty of doing "all things needful for the maintenance, prosperity and success of the schools, and the promotion of education * * *."[6] The duties of the board include that of purchasing schoolhouse sites and erecting and remodeling school buildings.[7] Also in harmony with the import of the statutes just referred to is the fact that it is inherent in the nature of the board's function in managing school district business that it have

4. State ex rel. Utah Savings & Trust Co. v. Salt Lake City, supra note 2; Brinkerhoff v. King, supra note 2; Atkins v. McAden, 229 N.C. 752, 51 S.E.2d 484, 486–87 (1949); see State ex rel. Harlingen v. Board of Educ., 104 Ohio St. 360, 136 N.E. 196 (1922), quoted in Barlett v. Bd. of Educ., 128 N.E.2d 267, 269 (Ohio Com.Pleas 1955).

5. Ewing v. Peak, 266 S.W.2d 300, 302 (Ky.1954); see Beard v. Bd. of Education, 81 Utah 51, 61, 16 P.2d 900, 904 (1932); Brantley v. Lake Cormorant Consol. School Dist., 152 Miss. 235, 119 So. 184, 185 (1928).

6. See Beard v. Bd. of Educ., 81 Utah at 59, 16 P.2d at 903–904 (1932).

7. Ibid.; Allen v. Bd. of Educ., 120 Utah 556, 567–568, 236 P.2d 756, 761 (1951); see Feezor v. Siceloff, 232 N.C. 563, 61 S.E.2d 714, 716 (1950); State ex rel. Clarke v. Bd. of Educ., 11 Ohio App. 146, 150 (1919).

a broad latitude of discretion in order to carry out its objective of providing the best possible school system in the most efficient and economical way.[8] Indeed it should be said that the board not only has this prerogative, but it could not divest itself of this duty. It is the policy of the law not to favor limitations on the powers of the administrative body, but rather to give it a free hand to function within the sphere of its responsibilities. For that reason, it is to be assumed that the board has and retains its prerogative of using its best judgment as to what course will prove to be of greatest advantage in serving the interests of the district in the long run.[9] And any representations made by it or its members should not be regarded as restricting that prerogative unless it clearly and unequivocally appears that the Board has made a binding commitment or so acted that justice and equity would require it to follow some predetermined course of action.[10] There is no basis to compel any such conclusion here.

 As is the case in other areas in our system of government, it is the citizen's right to vote for and elect officials he thinks best qualified to represent his interests. Having so elected the school board, he then must trust them to administer the school program. But it is not his privilege to intrude directly into the management of school affairs. This principle carries over into the bond election. The taxpayers may give or withhold their consent to the issuance of bonds and the creation of the indebtedness. But if the consent is given, the disposition of the money raised then becomes the responsibility of the board. This is not to say that the voters are entirely without remedy. If they believe an unwise course is being followed, there is nothing to prevent them from petitioning the board for further hearings on the matter and bringing to bear whatever force of argument or persuasion is available. Moreover, the power of the future ballot always exists which may influence policies of the board.[11] It is also true that if it were shown that there existed some actual deceit, fraud or corruption; or if the board was acting outside the scope of its authority, or was so completely failing to follow the course of its

8. Allen v. Bd. of Educ., supra note 7; Beard v. Bd. of Educ., supra note 6; State ex rel. Clarke v. Bd. of Educ., 11 Ohio App. at 148–149.
9. See supra note 4; State ex rel. Clarke v. Bd. of Educ., 11 Ohio App. at 149; Sarratt v. Cash, 103 S.C. 531, 535–536, 99 S.E. 256, 258 (1916).
10. See Sec. 53–10–13, U.C.A.1953; Brinkerhoff v. King, supra note 2; State ex rel. Utah Savings & Trust Co. v. Salt Lake City, supra note 2; Anselmi v. City of Rock Springs, supra note 2; State ex rel. Clarke v. Bd. of Educ., supra note 8.
11. Beard v. Bd. of Educ., 81 Utah at 83, 16 P.2d at 912; Allen v. Bd. of Educ., 120 Utah at 567–568, 236 P.2d at 759; see, in general, 43 C.J.S. Injunctions § 112, p. 638, n. 99.

**112**

duties that its actions could be classified as capricious and arbitrary, redress might be had in the courts. But under the facts shown here, the conduct of the Board cannot be so classified. Accordingly, the proposed building program, involving its judgment and discretion, cannot properly be interfered with.

Finally, the conclusion we have arrived at here is in conformity with what we regard as the sound and well-advised policy of reluctance of courts to intrude into the functions of other branches of government. This reluctance is due in part to an awareness of the sometimes awesome responsibility of having to circumscribe the limits of their authority. Even more persuasive is an appreciation of the importance in our system of the concept of separation of powers so that each division of government may function freely within the area of its responsibility. This safeguarding of the separate powers is essential to preserve the balance which has always been regarded as one of the advantages of our system.[12] These are the considerations which we think render it imperative that courts resist efforts to use them for the purpose of interfering with or attempting to control matters of judgment and determination of policy within other departments of government.

On the basis of the facts herein recited and principles applicable thereto as discussed in this opinion, we have concluded that the defendant School Board should be allowed freedom to act as its judgment dictates. The order of the district court is vacated. Costs to defendant (appellant).

HENRIOD, C. J., and McDONOUGH, CALLISTER, and WADE, JJ., concur.

12. See statement in Wood v. Budge, 13 Utah 2d 359, 362, 374 P.2d 516.